# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 4, 2009          Decided February 26, 2010

No. 07-3100

UNITED STATES OF AMERICA,
APPELLEE

v.

TERRY DAVIS,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 06cr00193-1)

*Tony Axam Jr.*, Assistant Federal Public Defender, argued the cause for appellant. With him on the briefs was *A. J. Kramer*, Federal Public Defender.

*Katherine M. Kelly*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Roy W. McLeese III*, *Elizabeth Trosman*, and *Michael K. Atkinson*, Assistant U.S. Attorneys.

Before: GINSBURG and TATEL, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

RANDOLPH, *Senior Circuit Judge*: Terry Davis served as national treasurer of the Phi Beta Sigma fraternity. Accused of stealing from the fraternity, he was indicted on ten counts of bank fraud, one count of first-degree theft, and one count of first-degree fraud. *See* 18 U.S.C. § 1344; D.C. CODE § 22-3211(b)(2); *id.* § 22-3221(a). The jury acquitted him of two of the bank fraud counts and convicted him of the remaining charges. The district court sentenced Davis to 51 months' imprisonment on each of the bank fraud charges and 24 months' imprisonment on the theft and fraud charges, all sentences to run concurrently, and ordered him to pay $217,746.79 in restitution to the fraternity. There are two evidentiary issues, the first concerning the court's refusal to admit testimony from Davis's wife, the second dealing with the court's admission of evidence regarding settlement talks despite Federal Rule of Evidence 408. Because the court's application of Rule 408 warrants reversal, we do not reach Davis's constructive amendment argument.

Founded at Howard University in 1914, Phi Beta Sigma has university and alumni chapters with more than 120,000 members. The fraternity obtains its funds from the annual dues of its members. When the dues arrive at the fraternity's Washington, D.C., headquarters, they are deposited into Phi Beta Sigma's general fund bank account and used to pay the fraternity's operating expenses.

The Phi Beta Sigma national treasurer is the elected, unpaid custodian of all fraternity funds. Two main financial controls cabin the treasurer's discretion in dealing with the funds. First, before any expense is paid, the fraternity's executive director, national president, and treasurer must each sign a "voucher" documenting and authorizing the payment. Second, the

president and the treasurer must co-sign each fraternity check. The executive director is a full-time employee with an office at the fraternity's headquarters; neither the president nor the treasurer have offices.  As a result, each check and voucher must be mailed from one officer to the next until all signatures are gathered.

Davis disregarded these policies during his tenure as national treasurer from 1999 to 2003.  Some checks he wrote without obtaining an approved voucher.  Many checks contained only Davis's signature.  On others Davis also signed or stamped the president's name.  In the spring of 2003, the fraternity investigated financial irregularities and learned that Davis had written checks to cash, a violation of another fraternity policy.  That June, the fraternity suspended Davis as treasurer.

The new treasurer, Jimmy Hammock, testified that he asked Davis to produce the financial records Davis maintained on the fraternity's behalf.  Davis provided some unused checks and financial reports but no cancelled checks or bank statements.  Hammock also asked Davis why he had written fraternity checks payable to cash.  Davis explained that he transferred the funds to the fraternity's payroll account.

Hammock testified about a second conversation with Davis regarding these checks.  Hammock told Davis the fraternity had found $29,000 in checks made out to cash, none of which was deposited in the fraternity's bank account as Davis had claimed.  Over an objection based on Rule 408 of the Federal Rules of Evidence, Hammock related the rest of the conversation: "Terry asked – he said 'Can we just split this $29,000.00 and make this situation just go away?' . . . .  I told him that [the] amount was in excess of a hundred thousand dollars.  Terry's statement to me at that point was, 'I can't afford to pay that amount,' and then I told him – I said, 'Terry, if you want to do some –

negotiate some kind of settlement, you need to talk to our legal counsel or our international president."

At trial Davis called his wife, Rhonda Davis, to support his account of the disputed checks – namely, that "although he had written checks made payable to cash and deposited those checks into his personal banking account, he had used funds derived from those checks to pay fraternity bills and to reimburse himself for fraternity debts he had paid using personal funds." Appellant's Br. 26. Rhonda testified that she saw her husband working at home on fraternity business "on a very regular basis every day, most of [the] time, in some way, shape or form." Asked about the "types of things" she saw him doing, she replied that "I would see him working on his computer with spreadsheets. I would – I would even help him mail things. I would see the money orders that had to be processed. I would wait for the Fed. Ex. man." Defense counsel later asked Rhonda to elaborate further: "You talked about seeing Mr. Davis make payments for fraternity expenses. Can you tell me a specific instance when you saw him make a payment for a fraternity expense?" After she responded "Yes, I can," the prosecutor objected.

The government's objection was that Rhonda's only personal knowledge of Davis's fraternity payments was derived from inadmissible hearsay, and that her only nonhearsay testimony was that she saw her husband receive bills, write checks, and purchase money orders. Such limited testimony, the government argued, should be excluded under Federal Rule of Evidence 403 as speculative and prejudicial.

The district court thoroughly considered the objection in a hearing the next day. Both sides then filed written memoranda and the court and counsel questioned Rhonda out of the jury's presence. Rhonda's responses focused on three types of

documents she saw in her home: checks, money orders, and fraternity bills.

Rhonda stated that she saw Davis write checks to pay fraternity bills and expenses. But she could only recall one check that Davis wrote from his personal checking account to pay a fraternity bill. Asked how she knew this check was for a fraternity expense, she said her husband told her the check was "for fraternity stuff." The court also asked Rhonda how she knew Davis was using money orders to pay fraternity bills. She recalled asking Davis about the money orders "the very first time" she saw them at their home. He told her he used money orders to pay fraternity bills because some vendors would not accept the fraternity's checks. Rhonda also testified on *voir dire* that she and her husband did not use money orders to pay household expenses, and that she saw bills from The Hartford and the utility company PEPCO, neither of which served her household. She did not claim to have seen Davis using money orders for any particular vendor other than The Hartford.

The district court sustained the government's objection and Rhonda briefly concluded her testimony. Davis then took the stand. Contradicting the testimony of the two national presidents under whom he served, Davis testified that they had authorized him to bypass the fraternity's financial controls. He admitted that he wrote fraternity checks to cash and deposited many of the checks in his personal account. Davis testified that he only used this money to pay the fraternity's vendors, fund its payroll account, and reimburse legitimate fraternity expenses – never to line his own pockets.

To explain the commingling of fraternity and personal funds, Davis described a circuitous system of financial transfers that he devised to pay fraternity obligations. He claimed that his personal account was merely a way station that allowed funds to

remit more quickly to vendors and banks wary of dealing directly with Phi Beta Sigma. Due in part to the fraternity's poor financial history, some vendors allegedly would not accept a fraternity check. And, according to Davis, the fraternity's bank denied access to newly deposited funds while a check cleared, which delayed payment of the fraternity's overdue bills. Davis stated that in order to transfer funds more quickly, he would write a fraternity check to cash, deposit the check into his personal account, and either write a personal check or use the proceeds to purchase a money order.[1] Then he would transmit the check or money order to a vendor, a separate fraternity bank account, or a fraternity officer due to be reimbursed. The net effect of the transfers, according to Davis, was to pay the fraternity's creditors and reimburse expenses he incurred on the fraternity's behalf.

The first issue presented in Davis's appeal is whether the district court properly excluded Rhonda's proposed testimony as hearsay. The Federal Rules of Evidence define hearsay as an out-of-court statement offered for its truth and generally bar its admission into evidence. FED. R. EVID. 801(c), 802. The Rules also prohibit a witness from testifying unless he has personal knowledge of the subject of his testimony. FED. R. EVID. 602. These provisions intersect if a witness satisfies Rule 602's personal knowledge requirement by relying on the truth of an out-of-court statement. "If the testimony of the witness purports to repeat an out-of-court statement, hearsay is the proper objection. If the testimony on its face purports to be based on direct perception of the facts described but is actually

---

[1] Davis said he sometimes wrote "payroll transfer" or "payroll tax transfer" on the memo line of the fraternity checks made out to cash. He said that on other occasions he wrote checks to cash and purchased money orders with the proceeds, without ever depositing the money in his personal account.

based on an out-of-court statement about those facts, the objection should be lack of personal knowledge." 27 C. WRIGHT & V. GOLD, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 6022, at 214-15 (2d ed. 2007); *see also* 2 MCCORMICK ON EVIDENCE § 249, at 137 (6th ed. 2006).[2]

The district court properly required Rhonda to demonstrate personal knowledge of the personal checks, money orders, and fraternity bills about which she proposed to testify, and to do so without relying on hearsay statements she read or heard. *See, e.g.*, *Pelster v. Ray*, 987 F.2d 514, 525 (8th Cir. 1993); *United States v. Brown*, 548 F.2d 1194, 1205 (5th Cir. 1977). As to personal checks, it became clear during *voir dire* that Rhonda could recall seeing only one check that Davis wrote on his own account to pay a bill to the fraternity. It also became clear that Rhonda only learned that this check was for a fraternity bill when her husband said it was for "fraternity stuff." The district court therefore correctly sustained the government's hearsay objection to her proposed testimony about personal checks.

As to money orders and bills, defense counsel pointed out that she read the bills and saw the money orders in her home. The court also heard Rhonda's *voir dire* testimony that the Davises did not use money orders and that The Hartford and PEPCO did not serve their household. The government insisted that because the bills and money orders amounted to hearsay, Rhonda's testimony about them would also be hearsay.

---

[2] Because the distinction between the two objections is based only on the form of the testimony, an objection invoking either rule is sufficient. 27 C. WRIGHT & V. GOLD, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 6026, at 252-54 (2d ed. 2007); 2 MCCORMICK ON EVIDENCE § 247 (6th ed. 2006); *see, e.g.*, *Elizarraras v. Bank of El Paso*, 631 F.2d 366, 374 (5th Cir. 1980).

Davis is correct that like checks, money orders are not hearsay. They are legally operative documents with a meaning independent of the truth of the words they display. *See* 30B M. GRAHAM, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 7005, at 46 n.2 (2006); *see also United States v. Pang*, 362 F.3d 1187, 1192 (9th Cir. 2004) (collecting citations). As "verbal acts," their significance "lies solely in the fact that [they] were] made, [so] no issue is raised as to the truth of anything asserted." FED. R. EVID. 801(c) advisory committee's note. A $100 money order made out to The Hartford instructs a financial institution to disburse $100 to The Hartford. It would make no sense to ask whether the money order was true. Such an "instruction is, by its nature, neither true nor false and thus cannot be offered for its truth." *United States v. Shepherd*, 739 F.2d 510, 514 (10th Cir. 1984). Just as a check is not a "statement" that can falsely influence federally insured lending institutions, *see Williams v. United States*, 458 U.S. 279, 284-85 (1982), neither is a money order a "statement" as defined by Rule 801(a).

Yet even if money orders are not hearsay, it does not necessarily follow that Rhonda actually relied upon the money orders – rather than other hearsay statements – to conclude Davis used these financial instruments to pay fraternity expenses. When asked during *voir dire* how she knew Davis used money orders to pay fraternity bills, Rhonda mentioned three things. She and her husband did not use money orders for household expenses; on several occasions she saw money orders her husband wrote to a vendor, The Hartford, that did not serve the Davis household; and the first time she saw Davis writing money orders she asked him what they were for, and he told her he was paying fraternity bills. To the extent Rhonda's knowledge derived from what Davis told her, rather than from the practice of her household or the words written on money

orders, the district court properly excluded her proposed testimony regarding the money orders.

Whatever more Rhonda could have added on this subject could not have amounted to much. Rhonda had already testified – without objection – that she "saw the money orders that had to be processed" by her husband in connection with his work for the fraternity. Her testimony thus informed the jury that Davis used money orders to pay fraternity bills. The only additional fact defense counsel sought to elicit over the government's objection was that Davis used the money orders to pay the fraternity insurance bill from The Hartford. Even if the district court abused its discretion in excluding this testimony, it is hard to see how this prejudiced the defense.

With respect to the fraternity bills, Davis argues that the bills were not hearsay because they did not assert the truth of anything; they simply instructed the fraternity to pay a debt. Yet the documents did contain assertions, in the form of sender and recipient labels. These simple labels in effect stated: "This document is a message from The Hartford, and its contents pertain to Phi Beta Sigma." *See* 31 C. WRIGHT & V. GOLD, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 7141, at 251-53 (2000); *cf. United States v. Vigneau*, 187 F.3d 70, 74 (1st Cir. 1999). And unlike words written on money orders, the labels asserted facts that can be characterized as true or false. This appears to be how the district court treated Rhonda's proposed testimony about the bills. As the court put it, she was prepared to make assertions – based on her reading of the documents – "that these bills were, in fact, bills that were sent to the fraternity on behalf of these various vendors."

Davis also contends that the bills, even if they contained assertions, were not hearsay because Rhonda's testimony was not offered to show the truth of those assertions. Rather,

Rhonda's "testimony about the bills was offered to show that [Davis] was on notice of instructions to pay, not that the fraternity had taken actions to incur the debt."  Appellant's Br. 28.  Davis is correct that documents "may be admitted for a material purpose other than the verity of [their] assertions." *United States v. Watkins*, 519 F.2d 294, 297 (D.C. Cir. 1975); *see* FED. R. EVID. 801(c) advisory committee's note; 30B M. GRAHAM, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 7005 (2006). Davis is also correct that decisions of this circuit have treated names written on bills and receipts as non-hearsay. But in those cases, the documents were offered to link the person whose name was written with the location where the document was found.  *United States v. David*, 96 F.3d 1477, 1481 (D.C. Cir. 1996); *United States v. Patrick*, 959 F.2d 991, 999 (D.C. Cir. 1992).[3]   The documents' relevance did not depend on their truth; their mere presence made the connection more likely.  Rhonda's testimony, on the other hand, relied on the truth of the sender and recipient labels – not their location – to identify the documents as fraternity bills.  Given defense counsel's failure to articulate a justification for Rhonda's proposed testimony independent of the labels' truth, the court did not abuse its discretion by excluding it.[4]

---

[3] Both decisions recognized that the documents *were* hearsay to the extent they were introduced to prove the matter asserted: that the defendant resided at the address listed on the document.  *See David*, 96 F.3d at 1480-81; *Patrick*, 959 F.2d at 1000.

[4] The policy underlying the best evidence rule, embodied in Federal Rule of Evidence 1002, appeared to animate the district court's judgment regarding Rhonda's proposed testimony.  In requiring litigants to prove the contents of a writing by introducing the writing itself, the rule guards against inaccuracy, fraud, and incompleteness. *See* 31 C. WRIGHT & V. GOLD, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 7162 (2000).  Rhonda's testimony regarding documents not introduced at trial would have raised these concerns.  But the best

While the court's evidentiary ruling barring Rhonda's testimony may not be entirely free from doubt, the court's application of Rule 408 is another matter entirely. Rule 408, which is set out in the margin,[5] excludes evidence of settlement offers and negotiations when the evidence is "offered to prove

---

evidence rule also affords litigants an opportunity to demonstrate that admission of secondary evidence is necessary because the writing itself is unavailable. FED. R. EVID. 1004. Because the government never made a best evidence objection, Davis was not called upon to produce the bills, checks, and money orders, although the court suggested that he should have done so.

[5] (a) Prohibited uses. – Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction:

(1) furnishing or offering or promising to furnish – or accepting or offering or promising to accept – a valuable consideration in compromising or attempting to compromise the claim; and

(2) conduct or statements made in compromise negotiations regarding the claim, except when offered in a criminal case and the negotiations related to a claim by a public office or agency in the exercise of regulatory, investigative, or enforcement authority.

(b) Permitted uses. – This rule does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a). Examples of permissible purposes include proving a witness's bias or prejudice; negating a contention of undue delay; and proving an effort to obstruct a criminal investigation or prosecution.

liability for, invalidity of, or amount of a claim." FED. R. EVID. 408(a).

Invoking Rule 408, Davis made a motion *in limine* to bar Jimmy Hammock from testifying about his second conversation with Davis. The defense motion quoted the following portion of an FBI report of an interview with Hammock in January 2004:

> Sometime between the National Conclave and August 2003, HAMMOCK had a telephone conversation with DAVIS, during which he confronted DAVIS about the checks made payable to cash and DAVIS' explanation [that] the money was deposited to the payroll account. DAVIS said the money had been deposited into the payroll account, but HAMMOCK replied "TERRY, I'm telling you, I've gone through the records and it didn't." DAVIS then unexpectedly said "what will it take to make this go away?" HAMMOCK responded that DAVIS needed to repay "whatever you took." DAVIS asked "what if I split the $29,000?" HAMMOCK told DAVIS the amount of missing money was in excess of $100,000.00, to which DAVIS responded, "Oh, I can't pay that much."

There can be no doubt that Davis offered to compromise a disputed claim. His offer was to split the $29,000 in checks to cash he thought the fraternity had discovered. The claim "was disputed as to validity or amount," FED. R. EVID. 408(a): Davis did not confess to taking the fraternity's money; he said that he had deposited the cash checks into the fraternity's payroll account; and Hammock rejected Davis's explanation. *See Affiliated Mfrs., Inc. v. Alum. Co. of Am.*, 56 F.3d 521, 527-28 (3d Cir. 1995). It is also clear that the government intended to introduce Davis's settlement offer in order to prove Davis's guilt, or in the words of Rule 408(a), his "liability." Offers to

settle are excluded even if no settlement negotiations follow. FED. R. EVID. 408(a)(1); *see, e.g.*, *Alpex Comp. Corp. v. Nintendo Co., Inc.*, 770 F. Supp. 161, 163-64 (S.D.N.Y. 1991). The Rule is meant to promote settlements. *See* FED. R. EVID. 408 advisory committee's note (1974). If one party attempts to initiate negotiations with a settlement offer, the offer is excluded from evidence even if the counterparty responds: "I'm not negotiating with you." *See* FED. R. EVID. 408 advisory committee's note (1972 proposed rule). It makes no sense to force the party who initiates negotiations to do so at his peril.

Rule 408 bars not only evidence of settlement offers, but also "statements made in compromise negotiations." FED. R. EVID. 408(a)(2). Davis's other statements to Hammock during their second conversation were of that sort. Davis asked what it would take to "make this go away"; Hammock said pay back what you took; Davis countered with his offer to split the $29,000; Hammock countered that the missing funds totaled more than $100,000. That Hammock understood this give and take as a compromise negotiation is confirmed by his trial testimony – not before the court *in limine* but cited by the government on appeal – that he told Davis to talk to the fraternity's president or lawyer if he wanted to settle the matter.

Although one-half of $29,000 has value – $14,500 worth to be exact – the government argues that Davis did not offer "valuable consideration" as the Rule requires. *See* FED. R. EVID. 408(a)(1). The government's argument apparently is that Davis's offer of $14,500 was not "valuable" because he owed a lot more. Under that theory, only a settlement offer exceeding the full amount of the disputed claim is an offer of valuable consideration. The framers of Rule 408 could not have intended any such thing. The policy embodied in the Rule is to foster compromises. And the very nature of compromise is that the parties settle their differences by making concessions.

The government also tells us that Hammock's testimony properly came in pursuant to the portion of Rule 408(b) stating that exclusion is not required "if the evidence is offered for purposes not prohibited by" Rule 408(a), including, for example, "proving an effort to obstruct a criminal investigation or prosecution. The "purposes" set forth in Rule 408(a) are proving "liability for, invalidity of, or amount of a" disputed claim. FED. R. EVID. 408(a). If evidence is introduced for some other purpose, Rule 408 is no bar. *See United States v. Technic Servs.*, 314 F.3d 1031, 1045 (9th Cir. 2002); *Carney v. American Univ.*, 151 F.3d 1090, 1095-96 (D.C. Cir. 1998). The problem for the government is that it wanted to use Hammock's testimony as evidence of Davis's knowledge of his own guilt, which is to say his "liability."

There is, as the government points out, a sentence in the 1972 advisory committee note to Rule 408 stating that an "effort to 'buy off' the prosecution or a prosecuting witness in a criminal case is not within the policy of the rule of exclusion." FED. R. EVID. 408 advisory committee's note (1972 proposed rule). But it would be a mistake to read much into that remark, particularly in cases in which the defendant's actions give rise to potential civil and criminal liability. The 2006 amendment to Rule 408, which made clear that the rule applied to both civil and criminal proceedings,[6] drew a distinction between civil disputes involving the government and civil disputes involving

---

[6] The circuits had been split on the issue. *Compare United States v. Arias*, 431 F.3d 1327, 1338 (11th Cir. 2005), *United States v. Bailey*, 327 F.3d 1131, 1146 (10th Cir. 2003), *and United States v. Hays*, 872 F.2d 582, 589 (5th Cir. 1989) (applying Rule 408 in criminal cases), *with United States v. Logan*, 250 F.3d 350, 367 (6th Cir. 2001), *United States v. Prewitt*, 34 F.3d 436, 439 (7th Cir. 1994), *and United States v. Baker*, 926 F.2d 179, 180 (2d Cir. 1991) (declining to apply Rule 408 in criminal cases).

private parties. Under amended Rule 408, a defendant's statements in settlement negotiations with government agencies may be admitted in a criminal case. FED. R. EVID. 408(a)(2). But if the civil dispute was with a private party, the defendant's offer of settlement and statements in negotiation may not be admitted in a criminal prosecution when "offered to prove liability for, invalidity of, or amount of a claim." FED. R. EVID. 408(a).

This still leaves the example in Rule 408(b) allowing the use of a defendant's settlement offer and statements in negotiation in order to prove the defendant's attempt to obstruct a criminal investigation. This example, and the statement in the 1972 advisory notes, are easy enough to understand when obstruction is one of the criminal charges. 18 U.S.C. §§ 1501 *et seq.*; *see, e.g.*, *Technic Servs.*, 314 F.3d at 1045. But even in such cases there may be difficulties. One problem is that settlement evidence, like other evidence, may be introduced for multiple purposes, some prohibited under Rule 408(a), some permitted under Rule 408(b). *See Old Chief v. United States*, 519 U.S. 172, 187, 190 (1997). Another problem is whether the "obstruction" illustration applies only to pending criminal investigations or also to potential investigations. In Davis's case, for instance, there was no date identifying the beginning of a criminal investigation and there was no evidence indicating that Davis knew of any criminal investigation when he talked to Hammock. There may be other difficulties in some cases. One might suppose that if – as in this case – the same acts give rise to potential civil and criminal liability, any settlement of the civil dispute could forestall or influence potential criminal proceedings. Yet to hold that offers of settlement and negotiations in that context amount to obstruction would be contrary to the purpose of Rule 408, *see* 23 C. WRIGHT & K. GRAHAM, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE

§ 5313, at 278 (1980), and would contradict the notes of the advisory committee in 2006.[7]

Davis was not charged with obstructing a criminal investigation or attempting to do so. We can say with some assurance that when he offered to split the difference on $29,000, he was not trying to bribe Hammock. All indications are that Davis was proposing to pay the money to the fraternity. It may be that an offer of settlement, excessive in amount, could be seen as an attempt to "buy off" a complaining party. But Davis's offer obviously was not of that sort, which is why Hammock rejected it out of hand.

The most important consideration is that the government did not introduce the Hammock-Davis conversation for the purpose of "proving an effort to obstruct a criminal investigation." FED. R. EVID. 408(b). When asked at oral argument whether this was the government's purpose, counsel for the government candidly admitted it was not. She explained, as the prosecutor had argued to the jury, that the conversation revealed Davis's consciousness of guilt. But that is one of the prohibited purposes in Rule 408(a). Consciousness of guilt proves "liability" for a disputed claim under Rule 408(a).

We therefore hold that the district court abused its discretion in permitting Hammock to testify regarding Davis's offer of settlement and the statements that followed. The government did not argue that if the court erred, the error was harmless. Although we have discretion to determine *sua sponte* whether an error is harmless, *see United States v. Pryce*, 938

---

[7] The notes state that if settlement offers and negotiations between private parties were admissible, this would be contrary to the policy of Rule 408 to avoid chilling such negotiations.

F.2d 1343, 1347-48 (D.C. Cir. 1991), we decline to do so here. Each side discussed the Hammock-Davis conversation in closing argument. Whether Hammock's testimony affected the outcome is not sufficiently clear to warrant our determining harmlessness *sua sponte*. *See id.* (citing *United States v. Giovannetti*, 928 F.2d 225, 227 (7th Cir. 1991)). Accordingly, we vacate the convictions and remand for further proceedings consistent with this opinion.