*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
MONAHAN, STEPHENS, and DEERWESTER
Appellate Military Judges

_____

**UNITED STATES**
Appellee

**v.**

**Kyle M. SIMON**
Sergeant (E-5), U.S. Marine Corps
Appellant

**No. 201900198**

Decided: 30 November 2020

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
John P. Norman (arraignment)
Nute A. Bonner (motions and trial)

Sentence adjudged 20 March 2019 by a general court-martial convened at Marine Corps Base Camp Pendleton, California, consisting of officer and enlisted members. Sentence approved by the convening authority: reduction to pay-grade E-1 and a bad-conduct discharge.

For Appellant:
*Lieutenant Gregory Hargis, JAGC, USN*

For Appellee:
*Lieutenant Kimberly Rios, JAGC, USN*
*Lieutenant Commander Timothy C. Ceder, JAGC, USN*

Senior Judge STEPHENS delivered the opinion of the Court, in which Chief Judge MONAHAN and Judge DEERWESTER joined.

_____

**This opinion does not serve as binding precedent, but
may be cited as persuasive authority under
NMCCA Rule of Appellate Procedure 30.2.**

_____

STEPHENS, Senior Judge:

Appellant was convicted, contrary to his pleas, of assault consummated by a battery and unlawful entry, in violation of Articles 128 and 134, Uniform Code of Military Justice [UCMJ].[1]

Appellant asserts three assignments of error [AOE], which we have combined and renumbered: (1) Appellant received ineffective assistance of counsel when his trial defense counsel [TDC] did not oppose the admission into evidence of a $2,500 payment Appellant made to his victim; and (2) Appellant's conviction for unlawful entry was factually insufficient because Appellant reasonably believed he was permitted to climb through the victim's barracks room window. We find no prejudicial error and affirm.

## I. BACKGROUND

### A. Appellant and Corporal Lima's Relationship

Appellant and Corporal [Cpl] Lima[2] had an "on and off"[3] romantic relationship that lasted approximately a year and a half. While they were a couple, Appellant would regularly make unannounced visits to Cpl Lima's first floor barracks room by climbing through her window. Once inside, she would tell Appellant if she was okay with him being there.

The romantic relationship ended when Cpl Lima learned Appellant had been unfaithful to her. The two remained friendly, continuing to communicate through social media. They also occasionally spent time together, doing such things as getting food together and practicing sword manual. However,

_____

[1] 10 U.S.C. §§ 928, 934.

[2] All names in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

[3] R. at 254.

after their breakup Cpl Lima never again permitted Appellant to enter her room uninvited.

## B. 29 May Incident

Over a month after their breakup, on the evening of 29 May 2018, Cpl Lima lay on her bed scrolling through her phone when Appellant climbed through her open window. Not wanting him in her room, she reacted angrily. Appellant responded by taking her phone and locking himself in her bathroom. A few minutes later he opened the door and, without saying anything to Cpl Lima, grabbed her full-length mirror and broke it in her bathroom. The two then argued and even physically fought, with Cpl Lima trying to push Appellant out of her room. The altercation ended when Cpl Lima left the room to retreat to her car.

## C. 29 June Incident and Aftermath

About a month later, on 29 June 2018, Appellant and Cpl Lima exchanged brief texts and said goodnight to each other. Appellant knew Cpl Lima had been drinking alcohol that evening. After texting her goodnight, he sent her several subsequent text messages offering her Pedialyte, wishing her "sweet dreams," apologizing for "blowing [her phone] up," and telling her "stay safe and have fun."[4] She did not reply to any of Appellant's texts.

Cpl Lima was later awakened by Appellant when he once again climbed through her window. She told him she did not want him there and their conversation quickly turned to his infidelity. The argument escalated into a physical altercation when she tried to push Appellant out of the room. When they slapped and pushed each other, Appellant threw Cpl Lima against a wall, causing her head to hit the sharp edge of the air conditioning unit. After Appellant eventually left, Cpl Lima discovered her head was bleeding. She took a shower and went back to sleep.

The next day, Appellant texted Cpl Lima to ask how she was. She responded by sending him pictures of her bloody shower water. The day after that, she texted him to tell him to stop messaging her family. She described the extent of her injuries and demanded he "just stay away from [her]."[5] Appellant replied with a long apology, which went unanswered.

---

[4] Pros. Ex. 9 at 2-3.

[5] *Id.* at 6.

A few hours later, Appellant texted her, asking if she received the $2,500 he had sent her electronically. Cpl Lima told Appellant, twice, that she neither wanted nor needed the money. But after Appellant urged her to use the money to pay for an attorney to help her gain custody of her younger sister, Cpl Lima told him she would deposit the funds into a savings account. At trial, she testified that she never asked Appellant for this money.

A few days later Cpl Lima told a close friend about the incident, which led to a report of the fight to Appellant's chain of command and eventually to the Naval Criminal Investigative Service [NCIS]. Cpl Lima's initial report included an allegation of a sexual touching for which Appellant was acquitted.

After the report was made to NCIS, Appellant's mother contacted Cpl Lima and asked her to return the $2,500. She told Cpl Lima the money was for Appellant's son. Cpl Lima immediately returned it.

### D. Litigation Concerning the Money Transfers

During pretrial litigation, the Government moved the military judge to admit evidence of Appellant's $2,500 payment to Cpl Lima. It argued this was admissible under Mil. R. Evid. 404(b) to show his consciousness of guilt. Appellant's TDC responded in writing that he was "not opposing the government's 404(b) motion."[6] At an Article 39(a), UCMJ, session, the TDC confirmed the evidence was admissible and that he had no objection to the Government's motion.

## II. DISCUSSION

### A. Waiver

Whether an appellant has waived an issue is a legal question this Court reviews de novo.[7] "Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right."[8] The Court of Appeals for the Armed Forces [CAAF] recently emphasized the waiver doctrine in *United*

---

[6] App. Ex. III at 3.

[7] *See United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017).

[8] *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009) (internal quotation marks and citation omitted).

*States v. Davis*[9] when trial defense counsel stated he had "no objection" to a military judge's proposed instructions. CAAF stated that the appellant had "directly bypassed an opportunity to challenge and perhaps modify the instructions" and in so doing, "waived any objection" leaving "nothing left for us to correct on appeal."[10]

Appellant urges us to consider that the issue was not waived because his TDC failed to recognize it in the first place. Appellant argues that despite the TDC waiving any objection to the use of the evidence of the money transfer under Mil. R. Evid. 404(b) as "consciousness of guilt," he never considered, and thus never objected—or waived any objection—to the evidence's admission under Mil. R. Evid. 408 as evidence of a compromise offer or negotiation.

Appellant points to a CAAF case, *United States v. Ahern*,[11] where an appellant affirmatively stated he had no objection to the admission of a surreptitiously-recorded phone call where he did not deny any wrongdoing. On appeal, he argued that the rule under which it was offered, Mil. R. Evid. 304, prohibited the government from arguing that his lack of a denial constituted an admission to the truth of the allegations. Under Mil. R. Evid. 304(a)(2), such a "failure to deny" is not an admission if an accused is "under investigation." He argued that he was indeed under investigation, though unaware of it, when he made the statements. CAAF did not reach the appellant's question. Instead, it held that appellant waived this under Mil. R. Evid. 304(f)(1), "Failure to so move or object constitutes waiver of the objection." CAAF added that this was "not a case where the rule uses the word 'waiver' but actually means 'forfeiture.'"[12] Appellant distinguishes *Ahern* as a "rule-based waiver" arguing that Mil. R. Evid. 408 has no corresponding internal waiver rule.

We disagree with Appellant's contention that the waiver at trial was somehow incomplete because TDC only waived objection under Mil. R. Evid. 404(b), but did not deliberately consider and then intentionally abandon his right under Mil. R. Evid. 408. When TDC stated he did not oppose the

---

[9] 79 M.J 329 (C.A.A.F. 2020). *Davis* was issued eight days after Appellant filed his Brief and Assignments of Error.

[10] *Id*. at 331.

[11] 76 M.J. 194 (C.A.A.F. 2017).

[12] *Id*. at 197.

admission of the evidence, even if it was offered under Mil. R. Evid. 404(b), he waived all objections to its admission at trial and agreed the Government would be able to use it to show consciousness of guilt. Because we find that Appellant validly waived objection to the admission of the evidence, there is "nothing left for us to correct on appeal."[13]

## B. Military Rule of Evidence 408

Assuming arguendo that Appellant did not waive his objection to the admission of the evidence, through the application of the doctrine of forfeiture we would review for non-constitutional plain error. We review for plain error de novo.[14] An appellant must demonstrate "(1) an error was committed; (2) the error was plain, clear, or obvious; and (3) the error resulted in material prejudice to substantial rights."[15] Under such an analysis, we would find no error, as Mil. R. Evid. 408 does not prohibit its admission.

*1. Military Rule of Evidence 408 does not prohibit admission of the evidence*

Mil. R. Evid. 408 prohibits the use of offers to compromise or evidence of negotiations to prove or disprove the amount or "validity" of a "disputed claim."[16] A military judge may admit such evidence for other purposes, such as "proving an effort to obstruct a criminal investigation or prosecution."[17] But for this Rule to be in effect, there must be a "disputed claim."

For example, when a Korean prostitute and her representative negotiated with American soldiers for payment in lieu of her taking a complaint of sexual assault to Korean civil and criminal officials, this fell within Mil. R. Evid. 408. This was because it was evidence of a claim for $2,500 in alleged damages to the prostitute that was negotiated down to $800.[18] Likewise, evidence of a malpractice settlement under the Federal Tort Claims Act by the United States on behalf of Navy doctors who treated an appellant's child

---

[13] *Davis*, 79 M.J. at 331.

[14] *United States v. Mullins*, 69 M.J. 113, 116 (C.A.A.F. 2010).

[15] *United States v. Patrick*, 78 M.J. 687, 699 (N-M. Ct. Crim. App. 2018) (internal citation omitted).

[16] Mil. R. Evid. 408(a).

[17] Mil. R. Evid. 408(b).

[18] *United States v. Jensen*, 25 M.J. 284 (C.M.A. 1987).

victim would be considered evidence of a disputed claim being settled.[19] So would an appellant's admission and agreement to compensate a bank for money he was accused of stealing from a friend's account at that same bank.[20]

A civilian case involving the identically-worded Federal Rule of Evidence 408, *United States v. Davis*,[21] is also an example of an offer to settle a disputed claim. When a treasurer for a national fraternity was suspected of embezzling, he was confronted by his successor. Davis offered to pay his successor a fraction of the allegedly embezzled amount to "make [the] situation go away."[22] The government improperly used this to show his consciousness of guilt, or as the U.S. Court of Appeals for the D.C. Circuit put it, "in the words of Rule 408(a), [appellant's] 'liability.'"

The Rule "is meant to promote settlements"[23] even if the counterparty flatly rejects the offer to settle the claim or even the possibility of negotiating the claim. This is so a party offering to negotiate is not beaten with his own his olive branch in court. Though the Rule, as in *Davis*, does prohibit using such evidence to prove "consciousness of guilt" of liability for a disputed claim, the Rule specifically allows the military judge to admit such evidence for another purpose, such as when an accused attempts to "buy off" a witness to his crime. The Rule only prohibits the use of compromise offers when the offers go toward a disputed amount or a disputed claim. Cpl Lima never asked for any money, twice rejected it when tendered, and returned it when Appellant's mother asked for it back. There was no claim here, so there was no corresponding compromise offer to prohibit.

---

[19] *Flynn v. United States*, 2008 CCA LEXIS 194 (N-M. Ct. Crim. App. May 22, 2008) (unpublished op.) (denial of writ of error *coram nobis* for post-trial discovery that Government settled malpractice claims for physicians who treated petitioner's child-victim because evidence of settlement would have been prohibited at trial under Mil. R. Evid. 408).

[20] *United States v. Cook*, 2005 CCA LEXIS 56 (N-M. Ct. Crim. App. Feb. 28, 2005) (unpublished op.) (error to admit agreement between appellant and Naval Federal Credit Union manager to pay back money he allegedly took from another Marine's account).

[21] 596 F.3d 852 (D.C. Cir. 2010).

[22] *Id*. at 854.

[23] *Id*. at 859.

*2. Appellant's counsel was not ineffective*

Appellant argues that his TDC was ineffective when he failed to object to the use of the evidence on the grounds that its use was prohibited by Mil. R. Evid. 408. We review claims of ineffective assistance of counsel de novo.[24] In *Strickland v. Washington*,[25] the Supreme Court laid out the test that guides our analysis. In order to prevail on such a claim, "an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice."[26] The Appellant bears the "burden of establishing the truth of factual matters relevant to the claim."[27] Only after an appellant has met his burden and has demonstrated both deficiency and prejudice can we find in the appellant's favor on an ineffective assistance of counsel claim.

Given the above analysis of Mil. R. Evid. 408, we find that had Appellant's TDC objected and raised this issue at trial, it would have had no "reasonable probability"[28] of success sufficient to "undermine confidence in the outcome."[29] We find no ineffective assistance of counsel.

## C. The Conviction for Unlawful Entry is Factually Sufficient

*1. Standard of review and the law*

The test for factual sufficiency is whether "after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [this Court is] convinced of Appellant's guilt beyond a reasonable doubt."[30] In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent

---

[24] *United States v. Harpole*, 77 M.J. 231, 236 (C.A.A.F. 2018).

[25] 466 U.S. 668 (1984).

[26] *United States v. Green*, 68 M.J. 360, 361 (C.A.A.F. 2010) (citing *Strickland*, 466 U.S. at 687).

[27] *Denedo v. United States*, 66 M.J. 114, 128 (C.A.A.F. 2008), *aff'd*, 556 U.S. 904 (2009).

[28] *United States v. Jameson*, 65 M.J. 160, 163 (C.A.A.F. 2007).

[29] *Strickland*, 466 U.S. at 694.

[30] *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017) (emphasis omitted) (quoting *United States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011)).

determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt."[31] When conducting this review, we are "limited to the evidence presented at trial."[32] Proof beyond a reasonable doubt does not mean, however, that the evidence must be free from conflict.[33]

To sustain a conviction for unlawful entry under Article 134, the Government must prove beyond a reasonable doubt that Appellant: (1) entered the real property of another which amounts to a structure usually used for habitation; (2) that such entry was unlawful; and (3) that under the circumstances, Appellant's conduct was prejudicial to good order and discipline or of a nature to bring discredit on the armed forces. Where raised by the evidence, as here, the Government must also disprove the defense of mistake of fact beyond a reasonable doubt. "Unlawful entry is a general intent crime, requiring no specific intent on the part of an accused to support any guilty finding."[34] Any mistake of fact must have "existed in the mind of the accused and must have been reasonable under all the circumstances."[35]

### 2. The evidence of unlawful entry was factually sufficient

The main thrust of Appellant's argument is mistake of fact. Appellant argues that when he climbed through Cpl Lima's barracks room window—even though he was mistaken that she consented to that entry—his belief that she did consent was reasonable. Appellant asserts that even after their breakup, he had a practice of entering Cpl Lima's barrack's room window. He did so, reasonably confident in her consent, because she would "let him know if it was okay"[36] after he climbed through the window.

In late June, Appellant climbed into Cpl Lima's room through the window with a bottle of water. He argues that he believed she knew he might be bringing her some water or Pedialyte. Appellant also points out that

---

[31] *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

[32] *United States v. Pease*, 75 M.J. 180, 184 (C.A.A.F. 2016) (quoting *United States v. Beatty*, 64 M.J. 456, 458 (C.A.A.F. 2007)).

[33] *United States v. Goode*, 54 M.J. 836, 841 (N-M. Ct. Crim. App. 2001).

[34] *United States v. Martinez*, 1998 CCA LEXIS 106, at *17-18 (N-M. Ct. Crim. App. Feb. 13, 1998) (unpublished op.) (rev'd on other grounds) (50 M.J. 344 (C.A.A.F. 1998)).

[35] Rule for Courts-Martial 916(j)(1).

[36] R. at 256.

Cpl Lima herself testified that he seemed surprised or confused that his entry was without her consent. "He didn't know, like, why I didn't want him there."[37] Finally, Appellant argues that his entry into Cpl Lima's room on 29 May and 29 June were essentially identical in nature, except that there is even less evidence of unlawful entry for the latter visit because he had a reason, which he believed was known to Cpl Lima, for the visit. Appellant was acquitted of unlawful entry for the May visit.

The Government counters that the standing invitation for Appellant to enter Cpl Lima's barracks room ended when they broke up. By late-June, they had been broken-up for two months and she had tried to "veer away from him."[38] On that specific night, she had not replied to any of his several text messages after they said good night. Appellant never asked or expressed a desire to Cpl Lima to visit her room that evening.

From the record, the only other time Appellant made an unannounced entry into Cpl Lima's room after their break-up was in May—about a month before the unlawful entry in question. That unannounced entry—though the members acquitted Appellant of unlawful entry for that visit—ended in a verbal and physical fight. Cpl Lima fled to her car. This is compelling evidence that Appellant's [mistaken] belief that Cpl Lima consented to his June 29 entry was an unreasonable one.

But we also evaluate the reasonableness of Appellant's mistaken belief by considering the text messages from earlier that evening. Appellant had texted Cpl Lima, saying he wanted to ask her something. She responded that another Marine had pulled the fire alarm in the building.

| | |
|---|---|
| Appellant: | Why |
| | Hopefully they can turn it off quick so people can sleep |
| Cpl Lima: | idk he always wanted to and we thought he was joking but he f[***]ing pulled it |
| Appellant: | Goodnight |
| Cpl Lima: | Night |

But he continued to text her.

---

[37] *Id*. at 270.

[38] *Id*. at 258.

> Appellant:    if they don't you can sleep here if you want
>
> Hopefully they don't know it was him
>
> Well, I still have your pedialyte and water if you need it in the morning
>
> Can you not talk for a minute
>
> Alright
>
> Sweet dreams
>
> You officially hate me lol
>
> Okay. Well sorry for blowing you up. All I'm going to say is stay safe and have fun.
>
> I care
>
> That's all[39]

Cpl Lima did not respond to any of these later texts. When Appellant entered her barracks room through the window, she was asleep.

From this, it is easy to conclude that Appellant was not in any way invited to her room. He also did not even ask if he could come to her room. Given that the romantic break-up—and the ending of the implied consent—was about two-months old, as well as the negative outcome from Appellant's previous unannounced visit, we find that his mistake of fact was not reasonable under the circumstances. Appellant had the duty to ascertain the true nature of Cpl Lima's consent and in doing so, to not exhibit "negligence or carelessness."[40] Appellant's "ignorance in this regard would hardly be that of a prudent person."[41] To the extent Appellant was seeking an invitation or consent to visit, he received no answer. To a prudent person, that means there was no consent and under the circumstances, no reasonable belief in consent. We find the conviction for unlawful entry to be factually sufficient.

---

[39] Pros. Ex. 9 at 2-3.

[40] *United States v. True*, 41 M.J. 424, 426 (C.A.A.F. 1995) (citing 1 Wharton, *Criminal Law and Procedure* § 157 at 382 (1957); 22 C.J.S. Criminal Law § 47 at 182; 15 Am Jur, Criminal Law § 306 at 9).

[41] *United States v. Mease*, 57 M.J. 686, 691 (N-M. Ct. Crim. App. 2002).

### III. CONCLUSION

After careful consideration of the entire record of trial, and the briefs from both parties, we have determined the approved findings and sentence are correct in law and fact and find no error materially prejudicial to Appellant's substantial rights occurred.[42] Accordingly, the findings and sentence as approved by the convening authority are **AFFIRMED.**

Chief Judge MONAHAN and Judge DEERWESTER concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court

---

[42] UCMJ arts. 59, 66.