304 Ga. 472
FINAL COPY

S18A0936. KIRBY v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Phillip Scott Kirby, Sr., was convicted of malice murder in connection with the stabbing death of Emily Mason. On appeal, he contends that his conviction should be reversed because the trial court erred in admitting custodial statements he made to GBI agents, hearsay testimony about a marking on his wedding ring, and evidence of other crimes he had committed. Finding no reversible error, we affirm.[1]

1. Viewed in the light most favorable to the verdict, the evidence presented at trial showed the following. In 2002, Emily Mason lived with her

---

[1] The murder occurred on April 29, 2002. On August 17, 2015, an Emanuel County grand jury indicted Appellant for malice murder and felony murder based on aggravated assault with the intent to rape and with a deadly weapon. Venue was changed to Toombs County, where Appellant's trial began on April 10, 2017. On April 19, the jury found him guilty of both charges. The trial court sentenced Appellant to life imprisonment for malice murder, merging the felony murder count (although it was actually vacated as a matter of law, see Malcolm v. State, 263 Ga. 369, 374 (434 SE2d 479) (1993)). Appellant filed a timely motion for new trial, which he later amended. After an evidentiary hearing, the trial court denied the motion on January 31, 2018. Appellant filed a timely notice of appeal, and his case was docketed in this Court for the April 2018 term and submitted for decision on the briefs.

husband Walt and their two young daughters in Swainsboro; the Masons were both professors at East Georgia College. About two weeks before the murder, Appellant and his co-worker visited the Masons' house to fix the hot water heater. During the repair, Appellant spoke briefly with Emily, Walt, and the Masons' older child. On the way back to their office, Appellant told his co-worker that Emily "looked good to him and he had to go back and see her."

Between 8:30 and 9:00 p.m. on the night of April 29, 2002, Walt left the Masons' house to go to Walmart to get some groceries. As Emily bathed the children, a man entered the house, confronted Emily, and began chasing her with a knife. The man chased Emily twice through the bathroom where the children were. Her older daughter, who was four years old at the time, later told a child psychologist that she recognized the man from "when he was fixing the place where the water is made hot." At trial, when she was 18, she testified that she had previously seen the man who chased her mother when he came to work at their house.

Shortly after Walt left Walmart at 9:39 p.m., he called Emily to ask if she needed anything else, but she did not answer. When Walt arrived home, he found Emily lying dead face down in a pool of blood in the kitchen hallway.

Her shirt had been pulled above her breasts, her pants and underwear had been pulled off her and were tangled under her left leg, and it appeared that blood had been wiped off her lower body, although later examination of Emily's body found no signs of vaginal or rectal trauma. Emily had been stabbed three times in the neck with a steak knife taken from a cutlery block in the kitchen; the knife was later found in the dishwasher. Other injuries, including a wound on her forehead and bruises and scrapes on her body, indicated that Emily had been in a struggle before she was killed. Walt ran out to the yard and called 911 at 9:51 p.m., screaming that his wife had been murdered and he did not know where his children were. The sheriff's officers who responded found the girls still in the bathtub. The GBI was called in to lead the murder investigation.

A Caucasian limb hair was found on the inside of Emily's pants, with enough follicular material to analyze for DNA. About two years after the murder, on June 25, 2004, the hair DNA was matched to Appellant in a DNA database. That match was confirmed using a blood sample from Appellant, who was incarcerated after being convicted of armed robbery and aggravated assault in 2003. After the murder, a man's wedding ring had been found in a hallway of the Masons' house. The ring was size 11, with a band that was six

3

millimeters wide and had a "TW" mark on the inside, which is the mark of the Tessler & Weiss jewelry manufacturer. According to a records custodian for a local jewelry store, the store sold Appellant a wedding ring in 2001 that was size 11, six millimeters wide, with the TW mark.

The GBI also determined that at 9:38 p.m. on the night of the murder, a deputy sheriff stopped to assist Appellant, whose car had veered off the road and through a ditch on Highway 56 less than two miles from the Masons' house. Appellant's shirt was covered in blood. He claimed that he was injured when his car crashed, and he had one or two superficial lacerations on his left arm, but he was not actively bleeding.

On June 28, 2004, GBI Special Agent John Durden interviewed Appellant in prison. The interview was audio recorded, and the recording was played for the jury at trial. Appellant claimed, among other things, that his ring size was 10 1/2, that he lost his wedding ring in the car accident on the night of the murder, and that he lived with his family in a trailer just a few miles from the Masons' house at that time but could not remember the trailer's address or landlord.

The record does not indicate clearly what, if anything, happened in the

4

investigation during the next 11 years.[2]  Then, on May 27, 2015, the day Appellant would have been released from prison for his 2003 convictions, he was arrested for Emily's murder by GBI Special Agent Joshua Alford.  After Agent Alford finished asking Appellant the identification questions needed for the GBI arrest record, Appellant said, "I knowed it was coming, it was inevitable, it happened."

While Appellant was in jail awaiting trial, he told his cellmate, who testified for the State without receiving any benefit, that on the day of the murder, his son was in the hospital so he needed money and wanted to steal something from the Masons; he believed that they were not at home when he entered the house; he killed Emily after he discovered her there and she confronted him with a knife; he put the knife in the dishwasher; he lost his wedding ring, which he wore on a chain around his neck rather than on his finger due to the electrical work he did, when he struggled with Emily; and he

---

[2]  The investigators had initially viewed Walt as the primary suspect based largely on some unusual statements he made during an interview with them shortly after his wife's murder, and he was arrested and indicted.  But there was no blood on his clothes when the sheriff's officers arrived on the night of the murder, the DNA of the hair found on Emily's pants did not match him, and the wedding ring found at the scene did not fit him.  After Appellant's June 2004 interview, the charges against Walt were dismissed.  Agent Durden testified that he wanted to arrest Appellant for the murder after Appellant's interview, but the District Attorney at that time was not willing to indict Appellant.

then staged a car accident to disguise the injuries she inflicted on him and fabricated a story about losing his wedding ring in the accident.

The State also offered evidence under OCGA § 24-4-404 (b) showing that Appellant committed robbery, aggravated assault with the intent to rape, and attempted rape in 1990 and armed robbery and aggravated assault with a deadly weapon in 2003. Appellant did not testify at trial. The main defense theory was that Walt killed his wife because she wanted a divorce; there was evidence that they had argued frequently leading up to the murder.

Appellant does not dispute the legal sufficiency of the evidence supporting his conviction. Nevertheless, as is this Court's practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdict, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of malice murder. See Jackson v. Virginia, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also Vega v. State, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'"

(citation omitted)).[3]

2.      Appellant challenges the admission of the custodial statements he made to GBI agents in June 2004 and May 2015 on the ground that the statements were made after he had invoked his right to counsel. We see no error.

(a)      At the beginning of the 2004 custodial interview, Agent Durden advised Appellant of his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966); Appellant waived his rights orally and in writing and agreed to speak with the agent. About 15 minutes into the interview, as Agent Durden was asking about the hair found on Emily, Appellant said, "I'm going to go ahead and get a lawyer because I see now where this is going. So uh, because I — I've got — I've got — I've got alibis, because I know." Agent Durden explained that the interview would end if Appellant wanted a lawyer before talking further, and after some back-and-forth discussion, Appellant said, "We can go ahead and talk." The interview then

---

[3] We note with respect to the discussion in Divisions 3 and 4 below that "in determining the legal sufficiency of the evidence, we consider all of the evidence that was admitted at Appellant's trial, even though some of the evidence should have been excluded." Kennebrew v. State, 299 Ga. 864, 867-868 (792 SE2d 695) (2016).

continued for another 30 minutes without mention of a lawyer.

"'A suspect who asks for a lawyer at any time during a custodial interrogation may not be subjected to further questioning by law enforcement until an attorney has been made available or until the suspect reinitiates the conversation.'" McDougal v. State, 277 Ga. 493, 498 (591 SE2d 788) (2004) (citation omitted).  See also Edwards v. Arizona, 451 U.S. 477, 484-485 (101 SCt 1880, 68 LE2d 378) (1981).  An ambiguous or equivocal statement about an attorney does not require officers to cease interrogation, however; a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Davis v. United States, 512 U. S. 452, 459 (114 SCt 2350, 129 LE2d 362) (1994).  See also McDougal, 277 Ga. at 499.

In this case, Appellant's statement "I'm going to go ahead and get a lawyer" was not an unequivocal and unambiguous request to have counsel present during interrogation.  The phrase "going to go ahead and get" could indicate Appellant's intention to obtain counsel in the future, and a future-oriented reference to counsel is not a clear request for an attorney that requires law enforcement officers to immediately end an interview.  See, e.g., Reaves v.

8

State, 292 Ga. 582, 586-587 (740 SE2d 141) (2013) (holding that the defendant's asking, "When will I have to come back with a lawyer?" referred to a future intention to seek counsel and was not an unequivocal request for counsel); Moore v. State, 272 Ga. 359, 360 (528 SE2d 793) (2000) (holding that the defendant did not clearly request counsel when he said: "I'd like to talk to [unintelligible] as far as who the public defender, or whoever my attorney is going to be.  Plus I'd like to sit down and see what she has to say" (punctuation omitted)); Wallace v. State, 267 Ga. App. 801, 808-809 (600 SE2d 808) (2004) (holding that "I got, I got — , I got proof, I got, I get a lawyer," and "I wanna go to a lawyer," indicated at most an intention to speak with a lawyer in the future and thus did not constitute a clear request for counsel).

When a defendant makes an equivocal reference to counsel, as Appellant did here, interviewing officers do not have to clarify the request, but they can. See Davis, 512 U. S. at 461-462.  After Agent Durden asked Appellant to clarify his statement, Appellant said, "We can go ahead and talk."  Because Appellant did not unambiguously invoke his right to counsel during the 2004 interview, the trial court did not err in admitting the full interview.

(b)    When Agent Alford tried to interview Appellant after arresting him

9

in 2015, Appellant unequivocally requested counsel before the agent could even read Appellant his Miranda rights. After that, Agent Alford did not ask Appellant any questions that pertained to the murder investigation, but he did ask for Appellant's identification information to complete the GBI arrest record. Appellant provided that information and then, as Agent Alford was leaving the room, Appellant said, "I knowed it was coming, it was inevitable, it happened." Agent Alford testified about that statement at trial.

Basic biographical questions asked in relation to an arrest are an exception to Miranda because such "booking" questions are unrelated to the investigation and serve a legitimate administrative need and therefore do not qualify as "interrogation." See Pennsylvania v. Muniz, 496 U. S. 582, 601-602 (110 SCt 2638, 110 LE2d 528) (1990) (plurality); Franks v. State, 268 Ga. 238, 239 (486 SE2d 594) (1997). Accordingly, "Georgia courts have allowed questions seeking basic biographical data, such as the suspect's name, age, address, educational background, marital status, and other information required to complete an arrest form," even after a defendant has invoked his right to counsel. Brooks v. State, 237 Ga. App. 546, 548 (515 SE2d 851) (1999). See also United States v. Zapien, 861 F3d 971, 976 (9th Cir. 2017) ("[T]he booking

10

exception can apply to questioning even after a defendant has invoked his right to counsel.").

When Appellant clearly invoked his right to counsel, Agent Alford had an obligation to stop interrogating Appellant about Emily's murder, and the agent complied with that duty. The agent was "not obliged, however, to stop listening to what [Appellant] chose to say or to immediately leave the room so that [the agent] could not hear him." State v. Brown, 287 Ga. 473, 480 (697 SE2d 192) (2010). The statement at issue was a spontaneous one, not induced by any questioning from the agent. Thus, the trial court did not err in admitting it into evidence. See id. See also Smith v. State, 292 Ga. 620, 623-624 (740 SE2d 158) (2013).

3. Appellant contends that the testimony of the jewelry store records custodian about the TW mark on the wedding ring sold to Appellant in 2001 was inadmissible hearsay. We agree, but we conclude that the error was harmless.

(a) During her testimony, the records custodian explained that she had no personal involvement in the sale of the ring; in fact, she worked at a different store location. Based on information in the sale record, she testified about the

date the ring was sold to Appellant as well as the size and width of the ring. Appellant did not object to this testimony, likely because that information was admissible under the business records exception to the hearsay rule. See OCGA § 24-8-803 (6).

When the prosecutor asked the records custodian if the ring had any markings, she answered: "I believe there was a marking on the inside. It does not show me that here [on the sale record]. That information I would have obtained from someone in my office — who handled the jewelry." Appellant objected on the ground that this testimony was inadmissible hearsay because it was based on something someone else told the witness. The trial court overruled the objection and then allowed the State to refresh the witness's memory with her 2004 statement to Agent Durden, in which she said that the ring had a TW mark inside the band. See OCGA § 24-6-612 (discussing the use of a writing to refresh a witness's recollection while testifying). Compare OCGA § 24-8-803 (5) (discussing the hearsay exception for admission of recorded recollections). After she reviewed her statement, the records custodian testified that in 2004 she knew that the ring had a TW mark. As explained in Division 1 above, TW is the mark of the jewelry manufacturer Tessler & Weiss,

12

and the wedding ring found at the crime scene had a TW mark inside the band.

(b)    The State argues that the witness's testimony was not hearsay because it was based on her refreshed recollection of what she knew in 2004. It is clear from her testimony, however, that even in 2004 her knowledge about the TW mark on the ring sold to Appellant was based not on her personal knowledge but rather on a statement someone else had given her.

OCGA § 24-8-801 (c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." And OCGA § 24-6-602 says, with exceptions not applicable here, that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of such matter." See United States v. Gutierrez de Lopez, 761 F3d 1123, 1132 (10th Cir. 2014) (explaining that a court should exclude testimony for lack of personal knowledge if "'the witness could not have actually perceived or observed that which he testifies to'" (citation omitted)).[4]

---

[4]  OCGA § 24-6-602 is part of Georgia's new Evidence Code, and its pertinent language tracks Federal Rule of Evidence 602. We therefore look to the decisions of the federal appellate courts, particularly the Eleventh Circuit, for guidance in applying this provision. See Olds v. State, 299 Ga. 65, 69 (786 SE2d 633) (2016).

13

Evidence proving personal knowledge may consist of the witness's own testimony, as OCGA § 24-6-602 explains, but a witness cannot use inadmissible hearsay to demonstrate personal knowledge of a matter. See, e.g., Anglin v. State, 302 Ga. 333, 340 (806 SE2d 573) (2017) (holding that the testimony of one officer about the contents of a surveillance video he did not watch was inadmissible hearsay because it was based only on what another officer, who had watched the video, told him); United States v. Davis, 596 F3d 852, 856 (D.C. Cir. 2010) (holding that a witness's testimony was inadmissible hearsay to the extent that it was based on what her husband told her about the checks at issue, rather than what she herself saw on them); Barnett v. Okeechobee Hosp., 283 F3d 1232, 1242 (11th Cir. 2002) ("[I]f [the witnesses] relied on statements from others in their office, then their comments were merely hearsay and should not have been considered . . . .").

Here, the records custodian knew about the sold ring's TW mark only through information provided to her by another employee, and that out-of-court statement was offered to prove that the ring in fact had such a marking. Her testimony on that point was therefore inadmissible hearsay, and the trial court erred in admitting it. See Anglin, 302 Ga. at 340.

14

(c) This evidentiary error, however, was harmless. "'The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict.'" Rivera v. State, 295 Ga. 380, 382 (761 SE2d 30) (2014) (citation omitted). See also OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . . ."). "In determining whether the error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so." Rivera, 295 Ga. at 382.

To begin with, there was no evidence as to how common or uncommon rings with the Tessler & Weiss mark are. And even without the testimony about the TW mark on Appellant's wedding ring, there was considerable evidence linking him to the wedding ring found in the Masons' house along with Emily's dead body, including the records custodian's testimony about the matching size and width of the ring sold to Appellant, his cellmate's testimony that he said he wore his wedding ring on a chain around his neck and lost it in a struggle with Emily and then fabricated a story about losing it in a car accident, and his statement to Agent Durden that he lost his wedding ring in that car accident on

15

the night of Emily's murder. Moreover, the other evidence of Appellant's guilt was compelling, including the testimony of the Masons' daughter and Appellant's cellmate; Appellant's limb hair found on the inside of the pants pulled off Emily's body and tangled under her leg; and an officer's finding Appellant covered in blood with no apparent source less than two miles from the Masons' house about 30 minutes after the murder. Under these circumstances, it is highly probable that the jury's verdict was not affected by the records custodian's hearsay testimony about the TW mark on Appellant's ring. See Anglin, 302 Ga. at 341.

4. At trial, the State offered evidence that Appellant had pled guilty to robbery, aggravated assault with intent to rape, and attempted rape in 1990 and armed robbery and aggravated assault with a deadly weapon in 2003. In addition to his certified convictions, the State presented testimony about the details of the crimes from the victim and investigating officer involved in each incident. Over Appellant's objections, the trial court admitted this evidence under OCGA § 24-4-404 (b) for the purposes of proving Appellant's intent and motive with respect to the crimes charged in this case. Appellant contends that these evidentiary rulings were erroneous. "On appeal, a trial court's decision to

16

admit evidence pursuant to OCGA § 24-4-404 (b) is reviewed for a clear abuse of discretion." Brannon v. State, 298 Ga. 601, 606 (783 SE2d 642) (2016).

Under OCGA § 24-4-404 (b), "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith," but such evidence is admissible for other purposes, including to prove intent and motive. The party offering evidence under OCGA § 24-4-404 (b) must show three things: (1) the evidence is relevant to an issue in the case other than the defendant's character; (2) the probative value of the evidence is not substantially outweighed by its undue prejudice; and (3) there is sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the other act. See Brannon, 298 Ga. at 606.

To determine whether, under the first part of this test, the evidence offered is relevant to a particular non-character purpose, we look to OCGA § 24-4-401, which defines "relevant evidence" as evidence that "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." This is a binary question — evidence is either relevant or it is not. See Olds v. State, 299 Ga. 65, 69-70 (786 SE2d 633) (2016).

17

The second part of the test is governed by OCGA § 24-4-403, which says:

Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Because the major function of OCGA § 24-4-403 is to "exclude matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect," the trial court's decision to exclude evidence under Rule 403 is "an extraordinary remedy which should be used only sparingly." Hood v. State, 299 Ga. 95, 102-103 (786 SE2d 648) (2016) (citations and punctuation omitted).[5]

Appellant does not dispute that the State satisfied the third part of the OCGA § 24-4-404 (b) test as to both the 1990 and 2003 incidents. We will examine the other two parts of the test as necessary for each incident and each purpose for which evidence about that incident was admitted.

(a) *Proof of Intent*

---

[5] The evidence statutes pertinent to this analysis — OCGA §§ 24-4-401, 24-4-403, and 24-4-404 (b) — are also parts of Georgia's new Evidence Code that largely track their counterparts in the Federal Rules of Evidence. We therefore have again looked to the decisions of the federal appellate courts, particularly the Eleventh Circuit, for guidance in construing and applying these provisions. See Olds, 299 Ga. at 69.

Evidence that tends to prove Appellant's intent in this case could be relevant because he put his intent at issue by pleading not guilty, and he did not take any affirmative steps to relieve the State of its burden to prove intent. See Hood, 299 Ga. at 102; Olds, 299 Ga. at 72-75.

> Where the issue addressed is the defendant's intent to commit the offense charged, the relevancy of the extrinsic offense derives from the defendant's indulging himself in the same state of mind in the perpetration of both the extrinsic and charged offenses. The reasoning is that because the defendant had unlawful intent in the extrinsic offense, it is less likely that he had lawful intent in the present offense.

United States v. Beechum, 582 F2d 898, 911 (5th Cir. 1978).[6] See also Olds, 299 Ga. at 72 ("[E]vidence that an accused committed an intentional act generally is relevant to show . . . that the same defendant committed a similar act with the same sort of intent.").

For the malice murder charge against Appellant, the State was required to prove that he acted with "malice aforethought, either express or implied." OCGA § 16-5-1 (a). See also id. at (b) (defining express and implied malice).

___

[6] We have recognized that in Bonner v. Prichard, 661 F2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of its predecessor Fifth Circuit issued before September 30, 1981. See Brown v. State, 303 Ga. 158, 163 n.2 (810 SE2d 145) (2018).

19

For the felony murder charge, the State was required to prove that Appellant caused Emily's death while in the commission of the felony alleged, see OCGA § 16-5-1 (c), which in turn required proof that he assaulted Emily with the intent to rape her and with the intent to use a deadly weapon. The State could prove that Appellant assaulted Emily with a deadly weapon either by attempting to commit a violent injury to her or by intentionally committing an act that placed her in reasonable apprehension of receiving a violent injury.[7]

If the other act evidence is determined to be relevant to intent, the next step is to weigh its probative value against its prejudicial effect, which must be done on a case-by-case basis and requires a "common sense assessment of all the circumstances surrounding . . . the extrinsic act and the charged offense."

---

[7] The State awkwardly indicted Appellant for one count of felony murder based on aggravated assault "by making an assault upon [Emily's] person with the intent to rape, by stabbing [her] with a deadly weapon, to wit: a knife." In this way, the count appears to be charging felony murder based on two distinct types of aggravated assault — assault with intent to rape and assault with a deadly weapon. See OCGA § 16-5-21 (a) (1), (2). The trial court told the parties that it was construing the count as a single crime, requiring the State to prove both the intent to rape and the deadly weapon elements. The State agreed with the court's approach, even though the court might have treated this charge as actually indicting two crimes, meaning the State only had to prove one form of aggravated assault to prove a felony murder, see Cash v. State, 297 Ga. 859, 861-862 (778 SE2d 785) (2015). The prosecutor explained to the jury during closing argument that the State had to prove both that Appellant assaulted Emily with the intent to rape and that he used a deadly weapon. Without objection, the trial court gave the jury instructions on both forms of aggravated assault and on both definitions of assault (attempting to commit a violent injury to the person of another, see OCGA § 16-5-20 (a) (1), and committing an act which places another in reasonable apprehension of immediately receiving a violent injury, see OCGA § 16-5-20 (a) (2)).

Bradshaw v. State, 296 Ga. 650, 657 (769 SE2d 892) (2015) (citation and punctuation omitted). In considering the probative value of evidence offered to prove intent, these circumstances include the prosecutorial need for the extrinsic evidence, the overall similarity between the extrinsic act and the charged offense, and the temporal remoteness of the other act. See id. at 657-658. See also Olds, 299 Ga. at 75-76 (discussing the calculation of probative value); Beechum, 582 F2d at 915 ("If [the other act and the charged offense] are dissimilar except for the common element of intent, the extrinsic offense may have little probative value to counterbalance the inherent prejudice of this type of evidence.").

(i)    *The 1990 Incident*

The evidence at trial showed that in September 1990, Appellant entered a convenience store in Emanuel County with a gun. He pointed the gun at the pregnant cashier and ordered her to give him all of the money in the cash register. After he took the money, he made the cashier go into the bathroom at gunpoint. He then pulled down her underwear, but when she pretended to go into labor, he fled. Appellant pled guilty to robbery, aggravated assault with

intent to rape, and attempted rape.[8]

Appellant's conduct during the 1990 incident did not involve the sort of malicious intent the State had to prove with respect to the malice murder charge in this case. But the 1990 incident (and Appellant's two rape-related convictions arising from that incident) did involve the same intent to rape the victim as the State had to prove with respect to the felony murder based on aggravated assault with intent to rape charged in this case. So the attempted rape aspect of the 1990 incident was relevant to this case.[9] In addition, Appellant's conduct in threatening the cashier with a deadly weapon evinced his intent to assault the cashier by putting her in reasonable apprehension of

_____

[8] Although the victim testified that Appellant used a gun, the written statement that Appellant gave to a police officer after his arrest, which was read to the jury by the officer and admitted into evidence, said that Appellant brought a *knife* to the convenience store and threatened the cashier with it to get her to open the cash register; he claimed that he then told her to go to the bathroom, and once she was inside, he closed the bathroom door and left.

[9] We note that the new Evidence Code includes a separate rule for the admission of evidence that a defendant charged with an "offense of sexual assault" committed another such offense. See OCGA § 24-4-413 (a) ("In a criminal proceeding in which the accused is accused of an offense of sexual assault, evidence of the accused's commission of another offense of sexual assault shall be admissible and may be considered for its bearing on any matter to which it is relevant."). The Court of Appeals has held that this rule establishes a stronger presumption in favor of admissibility than OCGA § 24-4-404 (b) and, unlike OCGA § 24-4-404 (b), allows the other act evidence to be admitted to show the defendant's propensity to commit sexual assaults. See, e.g., Benning v. State, 344 Ga. App. 397, 401-403 (810 SE2d 310) (2018). But the State did not offer the 1990 attempted rape evidence under OCGA § 24-4-413 at trial, the trial court did not admit the evidence on that ground, and this Court has not yet opined on that provision of the new Code, much less its application in a case like this.

receiving a violent injury. That same intent was at issue in this case, as one of the ways the State could prove the aggravated assault with a deadly weapon predicate for the felony murder charge was by showing that Appellant intentionally committed an act that put Emily in reasonable apprehension of receiving a violent injury. Finally, while Appellant's theft of money during the 1990 incident involved a type of intent not involved in any crime charged in this case, so the robbery aspect of that incident might not be relevant in isolation, Appellant's robbery of the cashier was still relevant because it was intrinsic to telling the story of the incident. Cf. Smith v. State, 302 Ga. 717, 725 (808 SE2d 661) (2017) (discussing evidence "intrinsic" to a charged offense). Any prejudice arising from that particular part of the story is properly considered under the OCGA § 24-4-403 part of the analysis, to which we now turn.

In considering the probative value of the 1990 incident, we begin with the recognition that the prosecution really needed evidence tending to prove Appellant's intent to rape Emily. The theory the State proposed to the jury at trial was that Appellant went to the Masons' house to steal from it, was surprised by Emily's presence, obtained a knife from her or the kitchen, stabbed her with it, and then attempted to rape her, but after trying to wipe away the

23

blood on the lower part of her body, decided to leave because she was too bloody, taking nothing from the house. The evidence (without the 1990 incident) was legally sufficient to prove an aggravated assault with intent to rape, but it was thin: Emily's shirt had been pulled up and her pants and underwear pulled off, the blood on her lower body appeared to be somewhat wiped off, and Appellant had told his co-worker two weeks before the murder that Emily "looked good to him and he had to go back and see her." The State had to counter evidence that Emily's body showed no signs of vaginal or rectal trauma and that Appellant told his cellmate that he planned to steal from the house believing no one was home and never mentioned anything about wanting or trying to rape Emily. Moreover, Appellant took no steps to remove the issue of intent to rape from the case; to the contrary, his counsel argued that Emily had not been sexually assaulted but rather someone other than Appellant (likely Walt) had killed Emily and staged the scene to look like an attempted rape. The high prosecutorial need for the evidence of the 1990 incident greatly increases its probative value. See Brannon, 298 Ga. at 608. See also Olds, 299 Ga. at 75-76 ("Probative value also depends on the marginal worth of the evidence — how much it adds, in other words, to the other proof available to establish the fact for

24

which it is offered.").

The 1990 incident and the charged crimes also have significant similarities. In both cases, there is evidence that Appellant went to a place intending to steal and at some point in that process used a deadly weapon to assault the person from whom he was planning to steal and pulled down her underwear, but then did not complete a rape. There are also some significant dissimilarities, including the setting (house versus convenience store); perhaps the weapon used (knife in this case versus gun in 1990, if the jury credited the cashier's testimony over Appellant's account); and the facts that Appellant used a knife already in the Masons' house to stab Emily and then stole nothing from the house, whereas he brought a weapon with him in the 1990 incident, did not use it to harm the victim, and stole cash from the store (although some of these differences may be attributable to circumstances out of Appellant's control, including the degree of resistance shown by his victims).

If evidence of the 1990 incident had been admitted to prove *identity*, these dissimilarities would be fatal to admissibility, as other act evidence offered for that purpose must be so similar as to demonstrate that the other act and the charged offense were "'signature' crime[s]," with the defendant using "'a modus

operandi that is uniquely his.'" Brooks v. State, 298 Ga. 722, 725 (783 SE2d 895) (2016) (quoting United States v. Phaknikone, 605 F3d 1099, 1108 (11th Cir. 2010)).[10] When other act evidence is introduced to prove *intent*, however, "a lesser degree of similarity between the charged crime and the [extrinsic evidence] is required." United States v. Delgado, 56 F3d 1357, 1366 (11th Cir. 1995). The trial court here had discretion to consider the similarities and differences and conclude that the evidence of the 1990 incident retained substantial probative value. See id.

As to the temporal proximity of the incidents, although more than 11 years passed between the 1990 crimes and Emily's murder in 2002, the prior acts were not so remote "'as to be lacking in evidentiary value.'" United States v. Roberts, 735 Fed. Appx. 649, 652 (11th Cir. 2018) (citation omitted). Moreover, Appellant was sentenced to concurrent sentences of 10 years in prison for his 1990 convictions. It is not clear from the record how long he actually served, but it is likely that he was incarcerated for a significant portion of the intervening years, and "'the prior crime need not be very recent,

---

[10] Thus, while the State also asked to introduce evidence of the 1990 incident to prove Appellant's "modus operandi," the trial court properly rejected its admission for that purpose. See Brooks, supra.

26

especially where a substantial portion of the gap in time occurred while the defendant was incarcerated.'" Id. (citation omitted).

Finally, we must compare the probative value of Appellant's conduct in 1990 against its prejudicial effect. It may be highly prejudicial to be cast as a rapist (or even an attempted rapist), but evidence of the 1990 incident was not a "matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." Hood, 299 Ga. at 103 (citation and punctuation omitted). On the contrary, Appellant was charged with intent to rape Emily, so he was already presented to the jury as an accused attempted rapist. Also, when the evidence of the 1990 incident was presented, the jury learned that Appellant had already admitted his guilt and been convicted and served a prison sentence for his 1990 conduct, making it less likely that the jury would want to punish Appellant for this past conduct rather than the charged crimes. See Beechum, 582 F2d at 914 (explaining that the risk that a jury may convict a defendant not for the offense charged but for his extrinsic conduct is greater where the extrinsic conduct was not already the subject of a conviction).

Moreover, the robbery aspect of the 1990 incident was not substantially prejudicial, given the attempted rape and armed assault aspects of that incident

27

as well as the evidence that Appellant planned to commit a theft from the Masons' house and used a deadly weapon against Emily. And as explained above, the 1990 evidence had much more than "scant or cumulative probative force." Under these circumstances, we cannot say that the trial court abused its discretion in admitting evidence of the 1990 incident. See, e.g., United States v. Lampley, 68 F3d 1296, 1300 (11th Cir. 1995) (affirming the admission of evidence of 15-year-old small marijuana deals to help prove intent for a charged large cocaine deal, "despite their differing nature and remoteness in time").

(ii)    *The 2003 Incident*

Our conclusion is different for the evidence relating to Appellant's 2003 crimes. The evidence at trial showed that in May 2003, Appellant brought a knife to another convenience store in Emanuel County, threatened the cashier, and left after she gave him the money in the cash register. Appellant pled guilty to armed robbery and aggravated assault with a deadly weapon. The 2003 incident did not involve malicious intent or the intent to rape. However, like Appellant's threatening the cashier with a deadly weapon in 1990, the intent Appellant displayed when he threatened the cashier with a deadly weapon in 2003 is the same intent the State could have used to prove that Appellant

28

assaulted Emily with a deadly weapon by committing an act that placed her in reasonable apprehension of receiving a violent injury. Thus, the evidence of the 2003 incident was relevant.[11]

The probative value of the 2003 incident, however, was minimal. Unlike the high prosecutorial need to use the 1990 incident to supplement the limited intrinsic evidence of Appellant's intent to rape Emily, there was overwhelming evidence that Emily was assaulted with a deadly weapon, and thus little if any prosecutorial need for extrinsic evidence to bolster that proof. The medical examiner testified that Emily had been stabbed multiple times and died from those wounds; Appellant told his cellmate that Emily confronted him with a knife and he used it to stab her; and a knife matching Emily's injuries was found in the Masons' dishwasher. Appellant disputed that he was the killer, but not that Emily had been stabbed to death. See Olds, 299 Ga. at 76 ("The stronger the other proof, the less the marginal value of the evidence in question.").

Also unlike the 1990 incident, the 2003 incident does not share any major similarities with the crimes charged in this case, but the differences are

_____

[11] As with the 1990 incident, we need not decide if the robbery aspect of the 2003 incident would be relevant in isolation, because the robbery again was an integral and interwoven part of the circumstances of the aggravated assault with a deadly weapon.

substantial. The only real similarity is Appellant's use of a knife in the assault. In 2003, Appellant brought a knife to the convenience store, used it to threaten the cashier and obtain money, and left the victim otherwise unmolested. In this case, Appellant went to a home without a weapon, found a knife there, used it to stab and attempt to rape the victim, and left with nothing. The aggravated assaults were therefore committed under very different circumstances. The 2003 incident and Emily's murder were separated by only a little over a year, but this temporal proximity alone does not make the 2003 incident more appreciably probative. For these reasons, the probative value of the 2003 incident is quite low.

This minimal probative value is weighed against the prejudicial effect of the evidence. The prejudice was reduced because the jury was properly presented with evidence that Appellant used a deadly weapon to assault and rob a convenience store cashier in 1990. But the 2003 evidence still had some prejudicial force, because it suggested that Appellant was not only an armed robber, but a serial armed robber — and indeed a violent criminal who kept committing dangerous crimes even after killing someone. Because this prejudice substantially outweighed the scant probative value of the 2003

incident, the trial court abused its discretion in admitting this evidence to prove intent. See Hood, 299 Ga. at 105. See also Brown v. State, 303 Ga. 158, 162-163 (810 SE2d 145) (2018).

(b) *Proof of Motive*

"Motive is the reason that nudges the will and prods the mind to indulge the criminal intent." Brooks, 298 Ga. at 726 (citation and punctuation omitted). "'Overall similarity between the charged crime and the extrinsic offense is not required when the offense is introduced to show motive,'" but the extrinsic evidence "must be 'logically relevant and necessary to prove something other than the accused's propensity to commit the crime charged.'" Id. (citations omitted). "To rule otherwise 'would make all prior robberies admissible in any robbery case, all prior murders admissible in any murder case, and so on.'" Id. (citation omitted).

The State argued at trial and in its brief to this Court that the fact that Appellant committed other violent crimes against women showed his "inclination" to use violence to obtain money and sex as he did in his crimes against Emily. That is a classic improper propensity argument, focusing on Appellant's violent, greedy, and lustful character and identifying his motive to

31

act in far too generic a fashion. The State has not shown a logical and necessary link between Appellant's motive to commit the charged crimes against Emily and his commission of a convenience store robbery about a year later. Because the 2003 incident was not relevant to prove Appellant's motive, the trial court abused its discretion in admitting evidence of his 2003 acts for this purpose. See Brooks, 298 Ga. at 726-727. See also Thompson v. State, 302 Ga. 533, 540 (807 SE2d 899) (2017).[12]

(c) *Harm*

Although the trial court erred in admitting evidence of the 2003 incident, that error was harmless. The properly admitted evidence included the evidence of the 1990 incident and Appellant's subsequent robbery, aggravated assault, and attempted rape convictions, so the jury was already aware that he had committed other violent crimes. And any prejudice from the evidence that he had committed two other sets of violent crimes rather than one other set was easily offset by the other compelling evidence against Appellant discussed in

---

[12] Under the circumstances of this case, we conclude, as we have before, that we need not evaluate whether the 1990 incident, which was properly admitted to show Appellant's intent, is also admissible to prove motive. See, e.g., Smart v. State, 299 Ga. 414, 418 n.3 (788 SE2d 442) (2016) (concluding that because the evidence in question was admissible to show motive, it was not necessary to determine if it was also admissible to show intent or absence of mistake).

32

Division 3 (c) above. We therefore conclude that it is highly unlikely that the erroneous admission of evidence about the 2003 incident affected the jury's verdict. See, e.g., <u>Hood</u>, 299 Ga. at 106 (explaining that although evidence of the appellant's past drug dealing was prejudicial, it was harmless in light of the strong evidence against him, including evidence of other drug deals).

<u>Judgment affirmed. Melton, C. J., Benham, Blackwell, Boggs, and Warren, JJ., concur. Hunstein, J., concurs fully in Divisions 1, 2, and 3 and in judgment only in Division 4. Peterson, J., concurs fully in Divisions 1 and 2 and specially in Divisions 3 and 4.</u>

PETERSON, Justice, concurring specially in part.

I join Divisions 1 and 2 in their entirety, but I cannot do the same as to Divisions 3 and 4. I agree wholeheartedly that any errors in admitting testimony of the jewelry store records custodian and evidence of the 2003 armed robbery and aggravated assault with a deadly weapon were harmless, and thus I concur in the majority's judgment affirming Appellant's conviction. But because any errors were harmless, determining whether the trial court actually did err is unnecessary to our decision. For that reason, I concur in the judgment only as to Divisions 3 and 4. See Chrysler Group, LLC v. Walden, 303 Ga. 358, 372-373 (812 SE2d 244) (2018) (Peterson, J., concurring specially in part).

Decided September 24, 2018.

Murder. Emanuel Superior Court. Before Judge Palmer.

Matthew K. Hube, for appellant.

S. Hayward Altman, District Attorney, John A. Fitzner III, Jessica B. Wilson, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hobbs, Assistant Attorney General, for appellee.