307 Ga. 889
FINAL COPY

S19A1261.  MORGAN v. THE STATE.

ELLINGTON, Justice.

A Chatham County jury found Jokeera Morgan guilty but mentally ill of murdering her two infant daughters by drowning them.[1] Morgan confessed to drowning her daughters, but she argued at trial that she was not guilty of murdering them because she was legally insane at the time. Morgan appeals from the order denying her motion for a new trial, contending that the trial court erred by (1) excluding expert opinion testimony concerning her ability to

---

[1] The crimes occurred on October 6, 2015. On December 29, 2015, a Chatham County grand jury indicted Morgan for two counts of malice murder, two counts of felony murder (each predicated on an act of aggravated assault), and two counts of aggravated assault. Following a trial ending on October 6, 2017, the jury found Morgan guilty but mentally ill on all counts. She was sentenced to life in prison for each count of malice murder, with the sentences to run concurrently. The remaining counts were either vacated by operation of law or merged. Morgan filed a timely motion for a new trial on October 23, 2017, which she later amended on January 2, 2019. Following a hearing, the trial court denied the motion on March 29, 2019. The trial court filed an amended order denying the motion for a new trial on April 3, 2019. Morgan timely appealed from the amended order, and her case was docketed in this Court for the August 2019 term and orally argued on September 10, 2019.

discern right from wrong, (2) admitting police body-camera video-recordings of her children's bodies, and (3) giving an incorrect charge on whether the jury could consider punishment during its deliberations on the issue of her guilt.[2] For the following reasons, we affirm.

Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial shows the following. On October 6, 2015, Morgan drowned her daughters in her Chatham County home. She immediately called 911 to report what she had done. The responding officers found the children's bodies where Morgan had told the dispatcher they would be. Morgan confessed to the homicides in a police interview, telling the officers that "while she was [drowning her daughters], she was thinking that she couldn't believe that she was doing it." The medical examiner confirmed that the children had drowned and that their manner of death was consistent with Morgan's description of how she had killed them.

---

[2] In light of this Court's recent opinion in *Foster v. State*, 306 Ga. 587, 590 (2) (832 SE2d 346) (2019), Morgan withdrew her third claim of error, conceding that *Foster* conclusively resolves that claim against Morgan.

In support of her special plea of insanity, Morgan introduced evidence of her history of mental illness, which included severe bipolar-I disorder, schizoaffective disorder, major depressive disorder, personality disorder, and polysubstance abuse. She also presented evidence of her strained relationship with the children's father, the circumstances preceding the homicides that she argued negatively affected her mental health, her lack of proper psychiatric treatment and medication, and, through expert testimony, her mental disorders and their effect on her behavior and thought processes. Morgan's experts, as well as the State's expert, testified that Morgan was experiencing a depressive episode of her bipolar-I disorder at the time of the homicides. Morgan's experts concluded that her symptoms were consistent with those of mothers who had committed "altruistic filicide," a homicide that results from a belief that a child is better off dead.

The State presented expert testimony that Morgan's bipolar disorder was "moderate," instead of severe; that malingering could not be ruled out; and that mentally ill people are often capable of

having ordinary criminal motives for committing crimes. With respect to that motive, the State presented the following evidence: Morgan lived in squalid conditions with the children's father, who was neglectful of the children and abusive and unfaithful to Morgan. Morgan once poured a pot of boiling oil on the children's father after she caught him in bed in their home with another woman. Morgan also had fantasized about stabbing the children's father with a hot knife and had expressed a desire that he feel the same "burning pain inside" that she did. Five days before the murders, the children's father told Morgan that he had never been in love with her, which Morgan said had broken her heart.

1. Morgan does not challenge the legal sufficiency of the evidence supporting her convictions. Nevertheless, in accordance with this Court's practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Morgan guilty but mentally ill beyond a reasonable doubt of the crimes of

which she was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (1) (673 SE2d 223) (2009) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (citation and punctuation omitted)); *Foster v. State*, 283 Ga. 47, 48 (1) (656 SE2d 838) (2008) ("A defendant claiming insanity has the burden of proving this affirmative defense by a preponderance of the evidence; unless the evidence of insanity is overwhelming, a jury determination that the defendant was sane at the time of the crime will be upheld.").

2. In support of her insanity defense, Morgan sought to introduce through one of her expert witnesses evidence that, two years prior to the murders, a psychologist had released her from a mental hospital after opining in a written discharge report that she "now appears to be competent and knows right from wrong." Morgan argued that the jury could infer from the psychologist's statement that, at some point before or during her hospitalization, her mental illness had rendered her legally incompetent and unable to

5

determine right from wrong. And, if Morgan's mental illness had rendered her unable to determine right from wrong in the past, then the jury could reasonably infer that her mental illness rendered her unable to determine right from wrong when she drowned her children. Morgan argued that OCGA § 24-7-704 (b) ("Rule 704 (b)"), which prohibits certain opinion testimony concerning a criminal defendant's mental state when that mental state constitutes "an element of the crime charged or of a defense thereto," did not bar the admission of the opinion, asserting that Rule 704 (b) did not apply if an expert's opinion testimony was about whether a defendant knew right from wrong at a time *other than* during the commission of the crimes charged. The trial court disagreed, finding that the psychologist's statement of opinion "called for a legal conclusion" that was "for the jury to determine" and that admitting the statement would violate Rule 704 (b).[3] Morgan asserts that the trial

---

[3] During its lengthy colloquy with counsel, the trial court expressed doubt about whether the psychologist's opinion that Morgan "knew right from wrong" at some point in the past was relevant to her mental state at the time of the crimes charged, especially since it was unclear whether Morgan had

6

court abused its discretion "by excluding expert opinion evidence that Morgan's bipolar-I disorder had deprived her [of her] ability to distinguish right from wrong at a time other than that of the homicides."

We need not decide, however, whether the exclusion of the psychologist's statement of opinion was error because, even if it were, any error was harmless and would not warrant reversal.[4] The psychologist's statement was from two years prior to the commission of the crimes charged. It was also a statement of opinion that

---

suffered from the same type of mental illness in the past. Nevertheless, without objection from the State, the trial court admitted into evidence a psychiatric evaluation from Morgan's prior hospitalization, redacting only the statement of opinion that Morgan "now appears to be competent and knows right from wrong." The court stated: "I don't have any problem with letting the record of Dr. Doss's assessment in. There's no problem with that. I just don't want the language to get in about his determination at the time he evaluated that she didn't know the difference between right and wrong. It's that simple. Everything else can come in. It's that one portion that needs to be redacted."

[4] "The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." (Citation and punctuation omitted.) *Kirby v. State,* 304 Ga. 472, 478 (3) (c) (819 SE2d 468) (2018). See also OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]"). "In determining whether the error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so." (Citation and punctuation omitted.) *Kirby*, 304 Ga. at 478 (3) (c).

Morgan did, in fact, know right from wrong when she was discharged from the hospital. Therefore, any inference the jury may have drawn from the psychologist's statement of opinion concerning Morgan's past sanity would have been of marginal help to the defense on the issue of whether she was insane at the time of the crimes charged. It may have even been helpful to the State, as the statement provided some evidence that Morgan was capable of discerning right from wrong despite her mental illness. Further, the psychologist's statement was but one sentence omitted from a written report that was admitted in evidence. Morgan offered that report as well as hours of expert opinion testimony concerning her history of mental illness, evidence from which the jury could have inferred that Morgan was mentally ill and that her mental illness rendered her incapable of determining right from wrong at the time of the crimes charged. As such, any inference that the jury may have drawn from the psychologist's statement of opinion would have added little to other more probative evidence of her insanity. Under these circumstances, we are unconvinced that any error in the

8

exclusion of the psychologist's statement had an effect on the outcome of the trial. See *Peterson v. State*, 274 Ga. 165, 168 (2) (549 SE2d 387) (2001) (Given the strength of the other evidence of the victim's violent acts, it was highly probable that any additional evidence of prior violent acts would not have affected the verdict, and any erroneous exclusion of that evidence was harmless.).

3. Morgan contends that the trial court abused its discretion in admitting into evidence video-recordings of the crime scene taken from the body cameras of two police officers who responded to her 911 call. She argues that the prejudicial impact of the video-recordings, each of which show the "discovery of and the performance of CPR on the drowned infants," substantially outweighs their probative value and, therefore, that the recordings should have been excluded under OCGA § 24-4-403 ("Rule 403"). For the reasons explained below, we see no abuse of discretion in the trial court's decision to admit into evidence the first of the two video-recordings. However, we conclude that the trial court abused its discretion in admitting a portion of the second video-recording

9

because the danger of unfair prejudice substantially outweighed its probative value. Nevertheless, error in the admission of that portion of the second video-recording does not require reversal because, under the circumstances of this case, it was harmless.

The record shows that Morgan objected to the admission of both video-recordings at trial, arguing that they should be excluded in their entirety. She did not suggest that specific portions of either video-recording should be redacted. She did, however, argue that the court had discretion to exclude from the video-recordings any portion that was not relevant, including "that these officers did everything they could to try and save the lives of those babies" by performing CPR. Morgan argued that the recordings had marginal probative value, given that she had admitted killing her children and that the State had ample other evidence proving the cause of their deaths. Morgan argued that the probative value of the recordings, which were projected "larger than life" on a screen, was substantially outweighed by the highly emotionally charged content of the recordings, which showed the lifeless bodies of the drowned

10

children, the first responders' vain efforts to revive them, and the allegedly emotional reactions of the police officers and emergency medical personnel. The State argued in opposition that the probative value of both recordings outweighed any prejudice. In support of that argument, the State asserted that it had no crime scene photographs and that the recordings were the only visual evidence of how the children had died. Further, the recordings captured Morgan's statements to the police, her demeanor immediately after the crimes, and the dirty and disordered state of her home.

After hearing arguments, the trial court admitted the video-recordings into evidence, but ordered the State to mute them, with the exception of any portion containing Morgan's statements. When the video-recordings were played for the jury, the prosecutor, on her own initiative, stopped the second recording before it ended, preventing the jury from seeing a portion of the recording showing two officers hugging each other. Each recording was played only once, during the State's case-in-chief. On appeal, Morgan reiterates

11

the argument she made at trial that both video-recordings should have been excluded in their entirety under OCGA § 24-4-403 because they were unnecessarily cumulative of other evidence admitted at trial and were substantially more prejudicial than probative.

The admissibility of crime scene photographs and video-recordings is generally governed by OCGA § 24-4-401, which defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"; by OCGA § 24-4-402, which provides that "[a]ll relevant evidence shall be admissible, except as limited by constitutional requirements or as otherwise provided by law or by other rules"; and by OCGA § 24-4-403, which provides that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative

evidence." "Decisions regarding relevance are committed to the sound discretion of the trial court and the exclusion of relevant evidence under Rule 403 is an extraordinary remedy that should be used only sparingly." (Citations and punctuation omitted.) *Venturino v. State*, 306 Ga. 391, 395 (2) (b) (830 SE2d 110) (2019) (discussing the admissibility of autopsy photographs).

The video-recordings were made at roughly the same time, and both show what transpired within the first minutes of the police officers' arrival in response to Morgan's 911 call. The State's first recording is less than four minutes long; the second, about six-and-a-half minutes long. In the first recording, Morgan can be seen standing in the doorway, talking on her cell phone, when the officer wearing the body camera arrives. Morgan appears responsive, though somewhat subdued. This recording shows the interior of the home, brief glimpses of the children's bodies and a police officer attempting to perform CPR on one of the children, and a female officer escorting Morgan from the residence. In this recording, views of the children's bodies are often blocked by other officers. As the

13

officer wearing the body camera moved through Morgan's home, his body camera captured scenes of a home that appears dark, dirty, and in disrepair. Although the recording shows the faces of some officers and responding medical personnel, it is difficult to see them in much detail because of the dim lighting. To the extent their faces can be seen, they appear focused and professional, displaying little emotion.

The second video-recording is from the perspective of the police officer who performed CPR on one of the children while inside the home. At about 11 seconds into the recording, the children's bodies are visible, though the dim lighting obscures some detail. As the officer wearing the body camera moves closer to the children's bodies, the recording reveals that the children are unclothed and unresponsive. They show no sign of external physical injury, such as cuts or bruises. One child can be seen lying on the hallway floor. The other is briefly seen floating face-up in a plastic tub full of water. After the child is removed from the tub, the officer wearing the body camera attempts to revive the child with CPR, which causes some

14

water and foam to emerge from the child's mouth and nose. During this four-minute period, the officer's body camera is mostly focused on the child's body, but the recording also shows images of the floor and walls as the officer changes his position over the body. When the ambulance arrives, the officers quickly take the children to it, where emergency medical personnel begin their efforts to revive them. Again, the officers and medical personnel appear calm, focused, and professional. There are no overt displays of emotional distress. The video-recording thereafter shows the officer walking from the ambulance to his patrol car. Although the recordings are in color, the low light makes them appear to be in black and white most of the time.

(a) *Relevance.* Although those portions of the video-recordings showing the officers performing CPR on the children's lifeless bodies are certainly disturbing to see — as are many images from crime scenes — those portions and both video-recordings as a whole were relevant to show the children's manner of death, the state of the home and where the children were found, Morgan's condition and

15

demeanor as she spoke to the responding officers, as well as to corroborate testimony concerning these matters from the State's lay and expert witnesses. See *Varner v. State*, 306 Ga. 726, 729 (2) (a) (832 SE2d 792) (2019) (The trial court did not abuse its discretion in admitting a police body-camera recording that depicted the victim with his blood pooling on the ground and flowing from his head and face as he waited for an ambulance, because although it was disturbing, it was relevant to show the crime scene.); see also *Davis v. State*, 306 Ga. 140, 145 (3) (b) (829 SE2d 321) (2019) (holding that "gruesome" video and photographic evidence depicting the crime scene and the victim's body were "relevant to the victim's identity and his manner of death, as well as to corroborate [witnesses'] testimony"); *Plez v. State*, 300 Ga. 505, 508 (796 SE2d 704) (2017) (explaining that "photographic evidence that fairly and accurately depicts a body or crime scene and is offered for a relevant purpose is not generally inadmissible under Rule 403 merely because it is gruesome").

(b) *Probative value.* Although Morgan concedes that the video-

recordings are relevant, she argues that they were of minimal probative value because they were needlessly cumulative of other evidence, given that she had admitted the children's cause of death and the only issue remaining for the jury to determine was whether she was criminally responsible for her acts.

Although Morgan confessed that she had drowned her children, the video-recordings were not needlessly cumulative of the manner of death because the State was not required to stipulate to the cause of death and the circumstances surrounding the murders. Generally, "a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the State chooses to present it." (Citation and punctuation omitted.) *Ross v. State*, 279 Ga. 365, 367 (2) (614 SE2d 31) (2005). Additionally, the video-recordings were probative of matters other than the children's manner of death. In this case, the State needed to rebut Morgan's insanity defense and to prove beyond a reasonable doubt all of the elements of the crimes charged in the indictment. To those ends, the video-recordings from the officer's body cameras helped illustrate

17

the State's prosecution theory that Morgan had killed her children in a manner that showed deliberation and an awareness of the wrongness of her actions: Morgan chose to drown her children one after another in a tub of water without inflicting cuts or bruises, calmly report her crimes to the police, and then wait for them to take her into custody.

By contrast, the last four minutes of the second video-recording showed little of the home, nothing of Morgan, and focused primarily on the officer's efforts to revive one of the children. Particularly, with the first recording in evidence, the State had scant, if any, need for this last portion of the second video-recording, a factor which significantly diminished its probative value. See *Olds v. State*, 299 Ga. 65, 75-76 (2) (786 SE2d 633) (2016) (probative value rests, among other things, on the marginal worth of the evidence and on the need for that evidence).

(c) *Prejudicial impact*. Morgan argued below and on appeal that those portions of the video-recordings showing the officers performing CPR on the children were unfairly prejudicial. The first

18

video-recording shows only brief glimpses of the officer in the background performing CPR. However, the second video-recording shows from the officer's perspective his efforts to revive one of the children by performing CPR. This portion of the recording lasts for about four minutes of the recording's six-and-a-half-minute length. Morgan argues that this portion of the video served no purpose other than to inflame the emotions of the jury.

We agree with Morgan that the last portion of the second video-recording showing the officer's effort to revive one of the children was unfairly prejudicial. Prejudice is not "unfair" simply because it tends to inculpate the defendant in an awful crime. See *Worthen v. State*, 306 Ga. 600, 606 (2) (832 SE2d 335) (2019) ("In a criminal trial, inculpatory evidence is inherently prejudicial; it is only when *unfair* prejudice substantially outweighs probative value that [Rule 403] permits exclusion." (citation and punctuation omitted; emphasis in original)). Rather, as the United States Supreme Court has explained, "unfair prejudice" is that which "speaks to the capacity of some concededly relevant evidence to lure the factfinder

into declaring guilt on a ground different from proof specific to the offense charged" or of an "'undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" (Citations omitted.) *Old Chief v. United States*, 519 U. S. 172, 180 (II) (B) (1) (117 SCt 644, 136 LE2d 574) (1997). See also *Pierce v. State*, 302 Ga. 389, 394-395 (1) (d) (807 SE2d 425) (2017) (same).

In this case, the four-minute-long portion of the second video-recording depicted, from the officer's close-up perspective, a dead baby girl sprawled on a dark hallway floor with water and foam oozing from her nose as the officer futilely tries to pump life back into her tiny, naked body. Such a video-recording, especially when shown on a large screen, is likely to incite feelings of revulsion, disbelief, shock, sadness, and anger. Under these circumstances, we conclude that this portion of the second video-recording had an undue tendency to suggest that the jury render its decision on an improper basis. Given this undue tendency, the prejudicial impact of this portion of the recording was unfair. See *Pierce*, 302 Ga. at 395 (1) (d).

20

(d) *Rule 403 balancing.* Applying the Rule 403 balancing test set forth above, we find no abuse of discretion in the trial court's admission of the first video-recording or the first part of the second video-recording. The prejudice inherent in those recordings was not unfair, nor did it substantially outweigh the recordings' probative value in showing the crime scene, the cause of the children's deaths, Morgan's demeanor, and other factors pertinent to the State's theory of the case. See *Varner*, 306 Ga. at 728-729 (2) (a). However, the trial court should have excluded the four-minute portion of the second recording showing the officer performing CPR on the dead child. We recognize that Rule 403 is an extraordinary remedy, and that in reviewing the admission of evidence under Rule 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact. See *Anglin v. State*, 302 Ga. 333, 337 (3) (806 SE2d 573) (2017). Nevertheless, so viewed, it is clear to us that the scant probative value of the last four minutes of the second video-recording was substantially outweighed by the danger of unfair prejudice from its

21

emotionally charged content and that admitting that portion of the recording was an abuse of discretion.

(e) *Harmless error.* Although the trial court erred in admitting a portion of the second video-recording, the error was harmless.[5] Our review of the trial transcript reveals that the video-recordings played a minor role in both the State's case and Morgan's theory of defense given that both the State and Morgan relied predominantly on expert testimony. Because Morgan admitted that she drowned her children, the paramount issue for the jury to decide was whether Morgan was criminally responsible for those actions. Both defense counsel and the prosecutor briefly described the crimes as "horrific" during their closing arguments, but each then spent the bulk of their time discussing the extensive lay and expert testimony bearing on the issue of Morgan's mental state and motivation at the time of the crimes. Morgan's counsel asserted during closing argument that Morgan sincerely believed "that drowning her two children was the only way to save them, the right way to save them," but that making

---

[5] See footnote 4, above.

22

that choice was "insane. It's absurd. It's not normal. She's not. And it's shocking, is what it is." And, to the extent that the four minutes of CPR in the second video showed how "horrific" the crime was, Morgan's defense counsel made use of the inherent horror of the crimes to argue that Morgan had to be insane to do what she did. Given the evidence presented, we see no likelihood that the jury would have weighed the case differently had the trial court excluded the last portion of the second video-recording. Considering the trial record as a whole, we conclude that it is highly probable that any erroneous evidentiary ruling by the trial court with regard to the admission of the second video-recording did not contribute to the jury's verdict.

(f) *Body-camera Recordings.* Although we have not found reversible error in the admission of the police officer body-camera recordings in this case or in *Varner,* 306 Ga. at 728-729 (2), it is important to note our concern about the use of this sort of evidence at trial. Body cameras are increasingly being used by law enforcement officers in Georgia and throughout the country. Body-

camera recordings can provide important benefits, including the creation of an objective record of interactions between officers and citizens.[6]

> While body cameras are generally conceptualized as a check on police power, they also present a rich opportunity for police officers to generate evidence in criminal prosecutions. As body cameras become a routine part of a police officer's equipment, video from those cameras will become virtually ubiquitous at trial.

Jeffrey Bellin and Shevarma Pemberton, Policing the Admissibility of Body Camera Evidence, 87 Fordham L. Rev. 1425, 1427 (2019). When used as evidence in a criminal trial, body-camera recordings may provide clear proof of pertinent facts – but they also may pose significant risks to the defendant's right to a fair trial.

A major concern is that a body camera records everything within its range. Some of the recorded images and sounds will likely

---

[6] See Howard M. Wasserman, Moral Panics and Body Cameras, 92 Wash. U. L. Rev. 831, 832-833 (2015) ("Expansive use of body cameras appears, on balance, to be good policy. It has overwhelming support from every stakeholder in the controversy — the public, the White House, federal legislators, police officials, police unions, and the American Civil Liberties Union."). See also Jocelyn Simonson, Copwatching, 104 Calif. L. Rev. 391, 396 (2016) (describing the use of police body cameras as "a practice hailed of late by scholars, politicians, and activists alike").

be relevant to the matter the officer was there to investigate, but some may be entirely irrelevant, even recognizing the need to provide context for the relevant portions. See OCGA § 24-4-401. The audio-recorded statements of the officer, those with whom he or she interacts, and those of people simply talking in the background may be inadmissible hearsay. See OCGA § 24-8-802.[7] In addition, video and audio of an event is often much more emotionally powerful than testimony or even still photographs, so the prejudicial impact of relevant body-camera evidence may substantially outweigh its probative value, particularly in cases involving violent crimes. See OCGA § 24-4-403. Finally, a video recording is the equivalent of a series of still images, so the playing of a length of body-camera video may be needlessly cumulative. See id.

For these reasons, simply playing a full body-camera recording for a jury will often create unnecessary risks of reversible

---

[7] OCGA § 24-8-802 provides: "Hearsay shall not be admissible except as provided by this article; provided, however, that if a party does not properly object to hearsay, the objection shall be deemed waived, and the hearsay evidence shall be legal evidence and admissible."

evidentiary errors. Although it requires more work for the parties and the court before trial, efforts should be made to identify the specific segments of a body-camera recording (which may be only the video or audio component of certain portions) that are properly admissible under the Evidence Code, so that only those segments are admitted into evidence and presented to the jury. This pretrial work can eliminate the need to resolve objections during trial and can preclude post-trial challenges to aspects of a body-camera recording that — had more attention been paid to the recording — would not have been deemed necessary to present as evidence.

*Judgment affirmed. All the Justices concur, except Peterson and Warren, JJ., who concur in the judgment and in all Divisions except for Division 3 (f).*

DECIDED FEBRUARY 10, 2020.
Murder. Chatham Superior Court. Before Judge Bass.
*Jackie L. Tyo, Brandon A. Bullard*, for appellant.
*Meg E. Heap, District Attorney, Emily C. Puhala, Jennifer L. Parker, Assistant District Attorneys; Christopher M. Carr, Attorney*

*General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Mark S. Lindemann, Assistant Attorney General*, for appellee.